UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. _____

JONATHAN E. PERLMAN, Esq.,
as court appointed Receiver,

      Plaintiff,

v.

PNC Bank, N.A.,

      Defendant.

_____/

## COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

Jonathan E. Perlman, the court-appointed Receiver ("Receiver") of the Receivership

Entities,[1] sues PNC Bank, N.A. ("PNC") and alleges:

### PARTIES, JURISDICTION AND VENUE

1.     The Receiver was appointed Permanent Receiver of the Receivership Entities by

_____

[1] Receivership Entities are Financial Freedom National, Inc. f/k/a Institute for Financial Freedom, Inc. and Marine Career Institute Sea Frontiers, Inc. d/b/a 321 Loans, Instahelp America, Inc., Helping America Group, United Financial Support, Breeze Financial Solutions, 321Financial Education, Credit Health Plan, Credit Specialists of America, American Advocacy Alliance, and Associated Administrative Services, 321Loans, Inc., f/k/a 321 Loans, Inc. d/b/a 321Financial, Inc., Instahelp America, Inc. f/k/a Helping America Team, Inc. d/b/a Helping America Group, Breeze Financial Solutions, Inc. d/b/a Credit Health Plan and Credit Maximizing Program, US Legal Club, LLC, Active Debt Solutions, LLC f/k/a Active Debt Solutions, Inc. d/b/a Guardian Legal Center, Guardian LG, LLC d/b/a Guardian Legal Group, American Credit Security, LLC f/k/a America Credit Shield, LLC, Paralegal Support Group LLC f/k/a Paralegal Support LLC, Associated Administrative Services, LLC d/b/a Jobfax, Cockburn & Associate LLC, JLMJP Pompano, LLC, Halfpay International, LLC, Halfpay NV, LLC, HP Properties Group, Inc., HP Media, Inc., Omni Management Partners, LLC, Nantucket Cove of Illinois, LLC, Discount Marketing USA, S.A., Viking Management Services, LLC, White Light Media LLC, Blue42, LLC, National Arms, LLC, and 110 Glouchester St., LLC, and their divisions, subsidiaries, affiliates (including but not limited to Shielded Legal Network LLC and Aegis Legal Center LLC), predecessors, successors, and assigns.

the United States District Court for the Southern District of Florida in an Order dated May 17, 2017 (the "Receivership Order") in the action styled *Federal Trade Commission, et al. v. Jeremy Lee Marcus, et al.*, Case No. 17-60907-CIV-MORENO (the "Enforcement Case").

2.      The Receivership Order authorizes and directs the Receiver to "institute … such actions or proceedings in state, federal, or foreign courts that the Receiver deems necessary and advisable to preserve or recover the assets of the Receivership [Entities] or that the Receiver deems necessary and advisable to carry out the Receiver's mandate under [the] Order."

3.      This Court has jurisdiction over PNC under 28 U.S.C. §§754 and 1692 and has subject matter jurisdiction over this matter under 28 U.S.C. §§754, 1367 and 1692. Venue is proper in this Court.

## FACTS COMMON TO ALL COUNTS

4.      On May 8, 2017, the Federal Trade Commission ("FTC") and the Office of the Attorney General, State of Florida, Department of Legal Affairs ("State of Florida") filed the Enforcement Case, alleging that Jeremy Lee Marcus ("Marcus") and others engaged in a scheme to bilk consumers of millions of dollars through phony loans and debt-relief services in violation of state and federal law.

5.      On May 9, 2017, this Court in the Enforcement Case entered a preliminary injunction appointing the Receiver as Temporary Receiver over eleven originally-named Receivership Entities (the "Receivership Defendants"). After an evidentiary hearing, the Court found that the FTC and State of Florida had established a substantial likelihood of success on the merits and, on May 17, 2017, appointed the Receiver as Permanent Receiver over the Receivership Defendants and "their affiliates, subsidiaries, divisions, or sales or customer service operations, wherever located, with the full power of an equity receiver."

6.     Upon being appointed, the Receiver, through his professionals, conducted an investigation of the Receivership Defendants' businesses and affairs. He secured the Receivership Defendants' physical offices and information systems (e-mail, file storage, telephone, and accounting), interviewed and deposed Marcus, interviewed dozens of the Receivership Defendants' employees, vendors, and outside professionals, and conducted a forensic accounting of the Receivership Defendants' businesses and assets.

7.     The Receiver's investigation confirmed that material allegations of the FTC and State of Florida against Marcus and his cohorts were correct.

8.     The Court entered orders on July 31, 2017, March 16, 2018, and August 24, 2018, expanding the Receivership Order to include all of the Receivership Entities.

9.     In April 2018, Marcus stipulated to entry of a permanent injunction barring him from engaging in telemarketing or providing debt relief/credit repair or financial services or products, and Marcus stipulated to entry of a monetary judgment against him in the amount of $85,326,648.45.

### The Underlying Scheme

10.     Between 2013 and May 2017, Marcus orchestrated a phony debt relief scheme that extracted more than $85 million from thousands of consumers using 142 internet domain names and 440 direct-dial phone numbers.

11.     Through a nationwide enterprise of 85 entities, Marcus employed telemarketers to misrepresent to consumers that the touted debt relief service would provide low-interest loans to pay off consumers' debt, sometimes falsely claiming that such low rates were available because the Receivership Entities were non-profit companies. Many consumers stated that the claimed non-profit status bolstered the scheme's credibility and made it seem legitimate. In reality, all

entities operated for Marcus' personal benefit or profit and were essentially engaged in the business of thievery.

12.     Consumers were also falsely told that their unsecured debts would be settled, or payment terms modified to reduce balances, interest rates, or fees. Consumers paid an immediate payment in violation of federal law, plus additional monthly payments in amounts ranging from $200 to $1,000 or more, primarily through automated ACH debits from consumers' checking accounts. Consumers believed this money was and would be used to resolve their debts.

13.     In reality, consumers did not receive low-interest loans to pay off unsecured debts; nor were consumer debts typically negotiated, settled, or resolved, despite the monthly payments being taken from consumers' checking accounts.

14.     Many consumers had worked for years with prior debt relief providers and saved thousands of dollars in escrow accounts to negotiate with their unsecured creditors before falling victim to Marcus' scheme. These consumers were told that various Receivership Entities were taking over servicing of the consumer's pre-existing debt relief accounts. Marcus, using the Receivership Entities, misappropriated the monies in their escrow accounts for his personal benefit or to perpetuate the scheme.

15.     Consumers paid millions of dollars and received little, if anything, in return. Consumers did not receive debt consolidation loans. Consumers generally did not get their debts paid, settled, or resolved, and did not see their credit improve. Instead, consumers were left in worse financial positions, some of whom were already in financial distress, elderly or disabled. Some consumers were ultimately sued by their creditors, and even forced into bankruptcy.

**Marcus' Asset Diversion and Investments with Titan Funding**

16.     When questioned under oath about the foregoing facts, Marcus refuted none of

them and instead invoked his Fifth Amendment privilege against self-incrimination. Before "taking the Fifth," however, Marcus admitted to the Receiver that he used consumers' funds to acquire property for his own personal benefit.

17.     Millions of dollars consumers paid to the Receivership Entities for debt relief services were diverted by Marcus either to maintain his lavish lifestyle, or to funnel monies out of the Receivership Entities into substantial real estate and hard-money loan investments that Marcus would own through various trusts and corporations. Purchases made with consumer monies included a $5 million waterfront home on the famous Las Olas Boulevard with a dock that could accommodate a 90-foot yacht and no bridges to bay, other homes including another one on the water, expensive watches, a gun collection, and gold coins.

18.     Marcus also diverted $14 million from the Receivership Entities to make hard-money loans and other investments through Titan Funding, LLC ("Titan Funding"). For a fee, Titan Funding originated loans funded by the Receivership Entities, most often Halfpay International, LLC.[2]

19.     Edward Piazza, one of Titan Funding's principals, was a PNC loan officer prior to forming Titan Funding in March 2014.

20.     On May 11, 2017, two days after the Court entered its initial asset freeze order, Piazza withdrew $350,000 from an account that was subject to the asset freeze order. Piazza made this withdrawal immediately after receiving two phone calls: one from Marcus, who called Piazza's partner to warn him that the Receivership Entities were being taken over by a federal agency; and the other from Denton Douglas ("Douglas"), a PNC vice-president who had

---

[2] Loan repayments were made to Titan Loan Servicing LLC ("Titan Servicing"), Titan Funding's sister company which serviced the loans, also for a fee. The Receiver will refer to Titan Funding and Titan Servicing together as "Titan."

introduced Marcus to Piazza. When Piazza and Douglas worked together at PNC, Douglas referred deposit customers, including Marcus, to Piazza for loan services. After Piazza started Titan Funding, Douglas, while employed by PNC, was a referral source between Marcus and Piazza on numerous deals.

### PNC's Knowledge and Participation in Marcus's Fraudulent Debt Relief Scheme

21.    Douglas met Marcus in early 2014, just after PNC had first opened accounts for a few of the Receivership Entities. Douglas and Marcus thereafter developed a business relationship that continued and blossomed even after PNC (temporarily) threw Marcus out of the bank in June 2014, as alleged in more detail below.

22.    PNC initially assigned Douglas, a vice-president of business banking, to the Receivership Entities' accounts to evaluate whether a specific wire transfer platform would be appropriate for Marcus' business in light of the large number of wire transfers going through the accounts.[3]

23.    PNC, upon opening the Receivership Entities' accounts and establishing a banking relationship with Marcus was required to conduct certain due diligence under the Bank Secrecy Act, 31 U.S.C. §§ 5311 *et seq.* ("Bank Secrecy Act") and other federal laws.

24.    Congress enacted the Bank Secrecy Act to address an increase in criminal money laundering activities utilizing financial institutions. Pursuant to the Bank Secrecy Act, all banks are required to establish and maintain an anti-money laundering compliance program that includes: (a) the development of internal policies, procedures, and controls designed to guard against money laundering; (b) the designation of a compliance officer to coordinate and monitor day-to-day compliance with the Bank Secrecy Act and anti-money laundering requirements; (c)

---

[3] In 2014, the Receivership Entities with accounts at PNC were American Credit Shield LLC, Shielded Legal Network LLC, and Paralegal Staff Support LLC.

the establishment of an ongoing employee training program; and (d) the implementation of independent testing for compliance conducted by bank personnel or an outside party.

25.     An effective anti-money laundering program is risk-based and incorporates certain principles into its business practices.  These business practices are commonly referred to in the industry as the Know Your Customer ("KYC") requirements. KYC requires banks to know the true identity of its customers and its customers' business, including verification of the business and of the source of monies that come into the account, to monitor its customers' transactions to determine that a legitimate reason exists consistent with the business of the customer, for transfers in and out of the customers' accounts, and to determine if transactions are unusual or suspicious and, if so, to report those transactions to the proper authorities and close the accounts if appropriate.

26.     Certain bank customers, due to the nature of their business, services, and transaction activity, are "more vulnerable or have been historically abused by money launderers and criminals," and certain activities, such as automated clearing house (ACH) transactions and funds transfers, "pose a higher risk of money laundering."  Financial institutions are required to conduct enhanced due diligence with effective policies, procedures and processes to deal with customers engaged in such businesses, transactions and services. The debt relief industry is particularly notorious for unlawful activity and money laundering. Indeed, the FTC reported in 2016 having already sued over 500 debt relief companies and related individuals for breaking the law.

27.     According to Douglas, PNC purportedly conducted KYC diligence when Marcus opened accounts at PNC in or around January 2014 and additional due diligence when he was brought in early that year.

28.     As alleged above, PNC immediately realized that the Receivership Entities were engaging in a very high number of wire transfers, which itself was a red flag and issue of concern.

29.     Additionally, PNC realized that Marcus was taking out substantial amounts in cash as profit, another cause for concern. Upon learning of Marcus' "substantial excess cash" problem, PNC vice-president Douglas began pitching Marcus investment opportunities for the cash.

30.     At the same time, PNC learned that Marcus and his associates were engaging in other suspicious and improper activities in connection with the Receivership Entities' accounts. For example, Receivership Entity employees reported to at least one PNC branch manager that Marcus was a "fraud," a liar, and was "doing fraud and he's not doing stuff that he promised the clients."

31.     PNC also learned that the Receivership Entities' PNC accounts appeared to be engaging in check kiting or another "check scheme."

32.     PNC also saw that the accounts were chronically overdrawn and being used to send an excessive number of wire transfers.

33.     PNC, through its vice-president Douglas, warned Marcus that its compliance department would likely close the PNC accounts if this conduct did not cease.

34.     Marcus, however, continued making the same suspicious, unlawful banking transactions.

35.     In July 2014, PNC terminated the accounts and froze funds in the accounts as a reserve against future claims.

36.     In addition to closing the accounts and freezing funds to protect itself from

liability for claims, PNC reported to other banks through its Early Warning Services system that it had closed its accounts with Marcus and the Receivership Entities "for cause." Early Warning Services is a company owned by PNC and other large banks that was created so banks could easily exchange information regarding their knowledge that certain customers have engaged in fraudulent or other unlawful conduct, and thereby prevent and combat future fraud.

37.     According to PNC vice-president Douglas, the "for cause" determination that PNC reported as the reason it had closed the Receivership Entities' accounts in 2014 means something "serious enough to shut it down … could be fraud, it could be money laundering, it could be something serious enough."

38.     In early August 2014, PNC vice-president Douglas communicated to Marcus that he was working to get Marcus' money out of the then-frozen PNC accounts.

39.     In mid-August 2014, Douglas pitched to Marcus a joint venture agreement for developing real estate in Port St. Lucie, Florida, and Douglas sent Marcus a proposed draft of a written joint venture agreement.

40.     Douglas also referred numerous real estate deals to Marcus in 2014, for Marcus to invest funds diverted from the Receivership Entities, for which he received referral fees.

41.     Douglas also referred hard-money lending opportunities to Marcus throughout 2014, again providing Marcus numerous opportunities to divert millions of dollars from the Receivership Entities. Douglas typically received a referral fee of 1 or 2-percent on these deals.

42.     In January 2015, Marcus requested Douglas' advice on obtaining loans against Marcus' substantial real estate portfolio (funded with funds plundered from the Receivership Entities).

43.     In August 2015, Marcus caused a Receivership Entity to loan Douglas $185,000

for the purchase of a parcel of waterfront land in Palm Beach on which Douglas intended to build his personal residence, as alleged in more detail below.

44.     PNC vice-president Douglas conducted business with Marcus using his PNC email account which PNC monitored, as well as through another email address and text messages.

### Nine Months after Closing the Receivership Entity Accounts "For Cause," PNC Opens New Accounts for the Receivership Entities Despite Its Knowledge of Unlawful Activity

45.     A banking relationship was critical to Marcus' debt relief scheme. Without access to commercial banking services, Marcus could not maintain the appearance of a legitimate debt relief business, could not receive the automated ACH withdrawals from consumers' accounts that provided the great majority of "revenues," could not make payroll for the telemarketers employed to dupe consumers, and could not engage in any other of the myriad transactions that cheated consumers out of their money and then diverted the ill-gotten funds from the Receivership Entities for Marcus' personal benefit. In short, the scheme could not exist without the assistance of a banking partner.

46.     Following PNC's closure of Receivership Entity accounts in July 2014, Marcus struggled to open or maintain accounts elsewhere. Bank of America kicked Marcus out next and Chase closed its accounts with Marcus and the Receivership Entities in about May 2015.

47.     PNC, through the Early Warning Services system and bank officer Douglas, was aware that Marcus and the Receivership Entities had been kicked out of other banks since departing PNC. Marcus asked PNC vice-president Douglas for advice, and they discussed possible solutions, including even changing Marcus' name and social security number.

48.     Marcus asked PNC, through vice-president Douglas, to again accept his accounts which PNC had closed only 9-months earlier "for cause," which determination PNC had reported

to the banking community, and with which decision other major banks had independently agreed.

49.     Shockingly, PNC agreed.

50.     In order to assuage PNC's concerns, Marcus, after discussing the matter with Douglas, offered to have his second-in-command, Craig Smith, (a co-defendant in the Enforcement Case), run the day-to-day business and be listed instead of Marcus on the new Receivership Entity accounts.[4] Marcus, however, remained the Receivership Entities' true owner and chief executive.

51.     On May 14, 2015, Marcus sent PNC a list of 10 entities for whom he wanted to open new accounts. PNC knew that two of the listed entities, American Credit Shield and Paralegal Staff Support, had been run out of the bank when it first closed the accounts in June 2014.

52.     PNC worked with Marcus' corporate counsel for his debt relief businesses, Katherine McGrath, to complete the account-opening process. When PNC conducted a Sunbiz.org search and saw Marcus listed as an officer of the entities for which accounts were to be opened, it advised Ms. McGrath that Marcus needed to be removed as an officer from these entities before the accounts were opened.

53.     In June 2015, PNC opened accounts for 12 different Receivership Entities. PNC brought Marcus back into the bank even though PNC knew (through its vice-president Douglas or otherwise), that: (i) PNC had previously kicked Marcus and certain Receivership Entities out of the bank for "cause," *i.e.*, fraud or money laundering, and had reported that conduct to Early

---

[4] Douglas has testified under oath in the Enforcement Case that he cannot recall whether it was his idea or Marcus' idea to name Craig Smith as the individual on the accounts instead of Marcus.

Warning;[5] (ii) at least one other financial institution, Bank of America, had likewise unilaterally closed accounts associated with Marcus and the Receivership Entities for cause; (iii) PNC had observed activity in the accounts that it knew (based on KYC diligence) could have no possible legitimate relationship to the Receivership Entities' purported businesses, such as rapid movements of funds from one Receivership Entity to another and inexplicable transfers between for-profit and purportedly not-for-profit companies; (iv) PNC knew that Marcus remained the person in control of the Receivership Entities after having nominally ceded control to Craig Smith; and (v) PNC knew that Marcus was actively seeking to evade the federally-mandated anti-money laundering compliance controls that had resulted in his companies being kicked out of numerous other banks. In the face of this knowledge, PNC raised no questions and simply opened and maintained accounts for entities that had been kicked out of PNC for cause a year earlier.

54.     In connection with the new accounts, Douglas and his supervisor at PNC, David Magaro, conducted a new round of KYC diligence, including touring Marcus' office in Pompano Beach and reviewing documents explaining the entities' purported businesses. This was done in connection with Marcus' request that PNC provide advance treasury management services, which PNC did provide. Douglas' supervisor, Mr. Magaro, met with Marcus in the course of the

---

[5] Before filing this lawsuit, the Receiver issued a subpoena to PNC out of the Enforcement Case seeking all of PNC's investigative documents with respect to the Receivership Entities' PNC accounts. PNC responded to that subpoena by falsely claiming that all responsive documents had been produced, despite that PNC, without ever objecting or notifying the Receiver that documents were being held back, failed to produce any of its investigative documents related to Marcus or the Receivership Entities and the 2014 account closures, the Early Warning report, or anything else concerning Marcus or the Receivership Entities. PNC's attempt to conceal the existence of its investigative documents (which will reveal precisely what PNC knew of Marcus' activity) speaks volumes about PNC's level of knowledge of Marcus' illegal and fraudulent conduct. PNC's conduct is the subject of a pending motion to compel and for sanctions in the Enforcement Case.

KYC diligence and actually toured the "boiler room" at the Pompano Beach office. Yet Magaro never questioned why the business' control-person, Marcus, was not a signer on the new accounts, nor how a "boiler room" operation could fit into any legitimate business operated by the Receivership Entities, nor why new accounts were being opened for the Receivership Entities after PNC had previously closed the accounts associated with them for cause.

55.     PNC knew in 2015, based on KYC diligence and information learned by PNC branch employees and relayed to branch managers and Douglas, that money was being transferred between the Receivership Entities' accounts in impermissible ways. PNC knew, in Douglas' words, that "big, big amount[s]" were being transferred "sideway, cross way, up and down, [across] all the 12 accounts"—including between accounts held by for-profit and (supposedly) not-for-profit companies, which PNC knew was improper. Ms. McGrath (Marcus' corporate counsel) frequently contacted PNC, through Douglas, and asked him to move funds among the accounts to cover payroll. Again, PNC clearly knew based on its KYC diligence that these transactions were improper and bore no relationship to the Receivership Entities' purported businesses.

56.     PNC also knew that Marcus was funneling money to offshore accounts. In or around July 2015, Douglas even provided a commercial reference letter on PNC letterhead for Institute for Financial Freedom, a Receivership Entity and purported not-for-profit entity, which Marcus used to open accounts in Panama and Puerto Rico. Douglas signed the letter as a Vice President of PNC. Marcus funneled about $400,000 of the Receivership Entities' funds to these offshore accounts.

57.     In August 2015, PNC (through Douglas) obtained a current Early Warning report on Marcus. In addition to showing that PNC had closed the Receivership Entity accounts for

"cause" in 2014, the report showed that as recently as July 2015, Bank of America also had closed an account associated with Marcus for cause, corroborating the information that PNC had learned directly from Bank of America. The report also reflected that Marcus previously had been reported to Early Warning by Chase Bank, SunTrust Bank, Wells Fargo Bank, Fifth Third Bank, and PNC, which, like Bank of America, reported that Marcus' accounts had been closed for cause.

58.     The same month that PNC received the Early Warning report, in August 2015, Marcus agreed to lend Douglas $185,000 to purchase real estate to build Douglas' personal waterfront residence (the "Embassy Drive loan").[6] Marcus caused a Receivership Entity, Halfpay International, LLC, to fund the loan, which was made to a Douglas-owned company and guaranteed by Douglas.

59.     PNC, despite all that it had learned through Douglas and otherwise, allowed the new Receivership Entity accounts to remain open through December 2015. In that time, many more millions of consumer dollars flowed into the PNC accounts, where they were plundered by Marcus. Altogether, an aggregate of over $32,841,210.53 flowed from the Receivership Entity accounts at PNC over the life of the banking relationship, most of it after PNC had already kicked Marcus out of the bank in 2014.

**Marcus and Douglas' Post-PNC and Post-Scheme Communications**

60.     The proposed Port St. Lucie real estate venture between Marcus and Douglas was never consummated and Douglas ultimately defaulted under the Embassy Drive loan.

61.     After being kicked out of the PNC for the second time in December 2015, Marcus engaged in persistent efforts to collect the Embassy Drive loan, including by threatening to

---

[6] At least $45,000 of the loan went to make under-the-table payments to others involved in the deal.

inform Douglas's supervisor at PNC of the default.

62.     In January 2017, Douglas sent Marcus a text message responding to Marcus' ongoing attempts to collect payment on the Embassy Drive loan:

> I helped your company in so many cases and each time you made promises and never kept any after you received help.

63.     In February 2017, Marcus sent Douglas a text message threatening that he was calling Douglas' boss if the Embassy Drive loan was not repaid, because "a banker shouldn't be there without paying his money," *i.e.*, Douglas should not fail to pay his debt to Marcus. Douglas responded:

> OK let's focus on solutions. Mutual Destruction is not productive.
>
> MAD
> Mutually Assured Destruction.

64.     As alleged above, after the Receiver's professionals seized the Receivership Entities' offices and bank accounts and the Court ordered the Receivership Entities assets frozen, two people called Titan Funding's Piazza: Douglas and Marcus. Immediately after that call, Piazza took $350,000 in violation of the asset freeze order, and Piazza has failed to comply with the Receiver's demands to turn over those funds.

65.     When questioned under oath about PNC, Marcus refused to answer any questions and asserted the Fifth Amendment:

> Q: Did the corporate defendants maintain bank accounts at PNC Bank?
> **A: I plead the Fifth.**
>
> Q: Isn't it true that the corporate defendants maintained bank accounts at PNC Bank?
> **A: I plead the Fifth.**
>
> Q: Isn't it true that you're aware that PNC Bank terminated its account relationships with the corporate defendants?

**A: I plead the Fifth.**

Q: Do you know who Denton Douglas is?
**A: I plead the Fifth.**

Q: Isn't it true that Mr. Douglas works at PNC Bank?
**A: I plead the Fifth.**

Q: Mr. Douglas has come and has interviewed with the receiver,
and Mr. Douglas has told us that in exchange for a vacant lot at
3716 Embassy Drive in West Palm Beach, he promised to provide
you with new banking relationships after PNC terminated?
**A: I plead the Fifth.**

Q: Are you aware of that?
**A: I plead the Fifth.**

Q: Is that true and correct?
**A: I plead the Fifth.**

66.     All conditions precedent to the filing of this action have occurred, been waived, or

are otherwise satisfied.

### COUNT I
### Aiding and Abetting Breach of Fiduciary Duty

67.     The Receiver re-alleges paragraphs 1 through 66 as if fully set forth herein.

68.     At all material times, Marcus was an officer and director of the Receivership

Entities and as such owed them a fiduciary duty to discharge his duties in good faith, with the

care that an ordinarily prudent officer or director in a like position would exercise, and in a

manner reasonably believed to be in the Receivership Entities' best financial interests.

69.     Marcus breached his fiduciary duty owed to the Receivership Entities by

exhibiting a willful, fraudulent, reckless and/or negligent disregard for the best financial interests

of the Receivership Entities by engaging in the above-described fraudulent scheme and diverting

the Receivership Entities' assets with no legitimate or justifiable business purpose.

70.     Marcus' breaches of fiduciary duty owed to the Receivership Entities actually and

proximately caused financial injury to the Receivership Entities in an amount exceeding $85,326,648.

71.     PNC had actual and constructive knowledge of Marcus' breach of fiduciary duty and rendered substantial assistance in regard to such breach by affording Marcus special privileges, by enabling and allowing continuous, suspicious, and obviously fraudulent banking activity, and by failing to adhere to federal, local and internal regulatory banking procedures and policies, and PNC is therefore liable for all damages actually and proximately caused to the Receivership Entities through the acts and omissions of Marcus.

WHEREFORE, the Receiver demands judgment against PNC for: (i) actual compensatory, consequential, incidental, special and exemplary/punitive damages in an amount to be proven at trial; (ii) such civil penalties as allowed by law; (iii) pre-judgment and post-judgment interest as allowed by law; and (iv) such other and further legal and equitable relief as the Court deems just and proper.

## COUNT II
### Aiding and Abetting Conversion

72.     The Receiver re-alleges paragraphs 1 through 66 as if fully set forth herein.

73.     This is an action seeking damages on the grounds of aiding and abetting a conversion by Marcus of funds received by the Receivership Entities from consumers.

74.     Marcus wrongfully asserted dominion and control over the property of the Receivership Entities in the PNC Bank Accounts (defined below) by misappropriating from those account in excess of $32,841,210 in consumer funds at PNC for his personal use and benefit, causing financial injury and damage to the Receivership Entities. These funds are specifically identified in the schedule attached hereto as Composite Exhibit "A."

75.     PNC had actual and constructive knowledge of Marcus' acts in misappropriating

the funds of the Receivership Entities by virtue of the transactions which occurred during the banking relationship among PNC and the Receivership Entities.

76.     PNC rendered substantial assistance to Marcus in the conversion of the funds of the Receivership Entities by violating banking regulations, including the KYC requirements of the Bank Secrecy Act, and other prudent and sound banking practices and procedures, and is therefore liable for all damages actually and proximately caused to the Receivership Entities through the conversion of funds undertaken by Marcus.

WHEREFORE, the Receiver demands judgment against PNC for: (i) actual compensatory, consequential, incidental, special and exemplary/punitive damages in an amount to be proven at trial; (ii) such civil penalties as allowed by law; (iii) pre-judgment and post-judgment interest as allowed by law; and (iv) such other and further legal and equitable relief as the Court deems just and proper.

**COUNT III**
**Avoidance and Recovery of Fraudulent Transfers**
**<u>Pursuant to Chapter 726 of The Florida Statutes</u>**
*(Transfers to PNC -- Intercompany Transfers)*

77.     The Receiver re-alleges paragraphs 1 through 66 as if fully set forth herein.

78.     This is an action under the Florida Uniform Fraudulent Transfer Act, Chapter 726 of the Florida Statutes ("FUFTA") to avoid and recover fraudulent transfers made from the Receivership Entities and Marcus to PNC.

79.     From January 2014 through June 2014 and July 2015 through December 2015, certain of the Receivership Entities, namely, (1) 321 Loans, Inc., (2) Active Debt Solutions LLC, (3) Aegis Legal Center LLC, (4) American Credit Security LLC, (5) American Credit Shield, LLC, (6) Breeze Financial Solutions, Inc., (7) Guardian LG LLC, (8) Halfpay International LLC, (9) Helping America Group, Inc., (10) Institute for Financial Freedom, Inc., (11) US Legal Club

LLC, and (12) Paralegal Staff Support, LLC (the "Receivership Bank Customers") opened and maintained business banking accounts at PNC (collectively, the "PNC Bank Accounts").

80.    In the course of operating the phony debt-relief scheme and diverting assets from the Receivership Entities, Marcus caused numerous transfers to be made between and among the Receivership Entities, including transfers from Receivership Entities to the PNC Bank Accounts of other Receivership Entities (the "Intercompany Transfers").

81.    Marcus misappropriated and misdirected funds from the Receivership Entities, including by making Intercompany Transfers. Funds the Receivership Entities received from consumers were supposed to have been used by the Receivership Entities to engage in the debt relief services promised to consumers and otherwise operate their businesses. However, Marcus commingled funds from the different Receivership Entities and used the commingled funds to purchase expensive real estate and luxury items for himself, relatives, and insiders, and to fund tens of millions of dollars in personal investments. Marcus often used funds misappropriated from one Receivership Entity to pay operating expenses of another Receivership Entity, including through Intercompany Transfers, to maintain the façade of the debt relief business.

82.    Each time Marcus engineered an Intercompany Transfer or other transfer of Receivership Entity assets for an unauthorized purpose, he harmed the Receivership Entity-transferor by converting and transferring assets rightfully belonging to the Receivership Entity in breach of Marcus' fiduciary duties. With each such transfer, the Receivership Entity-transferor obtained a "claim" against Marcus, because a "claim" under FUFTA is "any right to payment," including a contingent, legal, or equitable right to payment. As such, the Receiver, standing in the shoes of the Receivership Entity-transferor, is a "creditor" of Marcus as defined by FUFTA, and is entitled to recover any transfer of assets controlled by Marcus which could have been

applied to satisfy the Receivership Entity-transferor's claim, including the very funds being transferred, *i.e.*, the Intercompany Transfers.

83.     Additionally, each Receivership Entity-transferor obtained a claim against the Receivership Entity that received an Intercompany Transfer. As such, the Receiver, standing in the shoes of the Receivership Entity-transferor, is a "creditor" of each Receivership Entity that received an Intercompany Transfer, and is entitled to recover any transfer of assets controlled by the Receivership Entity which could have been applied to satisfy the Receivership Entity-transferor's claim, including the very funds being transferred, *i.e.*, the Intercompany Transfers.

84.     Further, each Intercompany Transfer reduced the funds available to satisfy the Receivership Entity-transferors' claims, which hindered and delayed the Receivership Entity-transferors' ability to satisfy their claims.

85.     Each Intercompany Transfer also harmed defrauded consumers, who held tort claims against the Receivership Entities as a result of the scheme, which claims could have been satisfied from the assets of the Receivership Entity-transferors had those assets not been transferred through the Intercompany Transfers. Thus, the Intercompany Transfers reduced the assets available to satisfy defrauded consumers and thereby hindered and delayed consumers' ability to satisfy their tort claims.

86.     As reflected in more detail on the schedule attached hereto as Exhibit "B," from January 2014 through June 2014 and July 2015 through December 2015, the Receivership Entities made Intercompany Transfers in the aggregate amount of $8,956,033.02, in furtherance of the scheme and Marcus' diversion of assets from the Receivership Entities:

| Receivership Entity Transferor | Amount Transferred |
|---|---|
| 321 Loans, Inc. | $669,000.00 |
| Active Debt Solutions, LLC | $2,231,000.00 |
| Aegis Legal Center, LLC | $36,000.00 |
| American Credit Security, LLC | $673,000.00 |
| American Credit Shield, LLC | $30,573.02 |
| Breeze Financial Solutions, Inc. | -- |
| Guardian LG, LLC | $1,398,000.00 |
| Halfpay International, LLC | $3,402,150.00 |
| Helping America Group, Inc. | $333,000.00 |
| Institute for Financial Freedom, Inc. | $85,000.00 |
| Paralegal Staff Support, LLC | $7,000.00 |
| Shielded Legal Network, LLC | $85,000.00 |
| US Legal Club, LLC | -- |
| US Student Loan Helpers, Inc. | $6,310.00 |
| **Total** | **$8,956,033.02** |

87.     PNC is a transferee of the Intercompany Transfers made for deposit to the PNC

Bank Accounts in the name of Receivership Bank Customers.

88.     As early as July 2014—and absolutely no later than June 2015, the date on which PNC allowed the Receivership Entities back into the bank despite PNC's extensive knowledge of Marcus' improper and fraudulent conduct—PNC received transfers in the aggregate amount of at least $32,846,450.01 while, at a minimum, on inquiry notice of Marcus' suspicious, wrongful, fraudulent or criminal activity and while having at least constructive knowledge that the transfers were part of Marcus' fraudulent scheme.

89.     Under FUFTA, the Receiver as a creditor may avoid the Intercompany Transfers as fraudulent transfers and recover their value from PNC because the Receivership Entities:

(A)   made the Intercompany Transfers in the furtherance of a fraudulent scheme or otherwise with actual intent to hinder, delay, or defraud existing or future creditors, including other Receivership Entities and consumers ; or

(B)   received less than a reasonably equivalent value in exchange for the transfers; and (i) were insolvent on the date that the transfers were made or became insolvent as a result of such transfers; or (ii) were engaged in business or a transaction, or were about to engage in business or a transaction, for which their remaining assets were unreasonably small in relation to the business or transaction; or (iii) intended to incur, or believed or reasonably should have believed that they would incur, debts beyond their ability to pay as they became due.

WHEREFORE, the Receiver demands judgment against PNC: (i) avoiding the Intercompany Transfers to the PNC Bank Accounts and recovering the amount of those transfers from PNC; (ii) pre-judgment and post-judgment interest as allowed by law; and (iii) such other and further legal and equitable relief as the Court deems just and proper.

**COUNT IV**
**Avoidance and Recovery of Fraudulent Transfers**
**Pursuant to Chapter 726 of The Florida Statutes**
*(Transfers to PNC to Clear Overdrafts in the PNC Bank Accounts)*

90.     The Receiver re-alleges paragraphs 1 through 66 and paragraphs 79 through 80 as if fully set forth herein.

91.     Between June and November 2015, the Receivership Bank Customers incurred overdrafts in the Receivership Bank Accounts in connection with the ongoing fraudulent activity being conducted by Marcus and others in and through the PNC Bank Accounts.

92.      To prevent this fraudulent activity in the accounts being discovered and revealing the scheme, and to otherwise hinder, delay, or defraud consumers and other creditors of the Receivership Entities, the Receivership Entities made transfers, including Intercompany Transfers, to PNC to pay back the overdrafts.

93.     As set forth on the schedule attached as Exhibit "C" hereto, the Receivership Entities made Intercompany Transfers and other transfers totaling $457,064.78 to PNC for deposit in PNC Bank Accounts, for the purpose of paying overdrafts totaling $112,960.48 in the PNC Bank Accounts (the "Overdraft Transfers").

94.     PNC is a transferee of the Overdraft Transfers.

95.     PNC received the Overdraft Transfers while on, at a minimum, inquiry notice of Marcus' suspicious, wrongful, fraudulent or criminal activity and while having at least constructive knowledge that the transfers were part of Marcus' fraudulent scheme.

96.     Under FUFTA, the Receiver as a creditor may avoid the Overdraft Transfers as fraudulent and recover their value from PNC because the Receivership Bank Customers:

(A)   made the Overdraft Transfers to PNC in the furtherance of a fraudulent scheme or otherwise with actual intent to hinder, delay, or defraud existing or future creditors, including the Receivership Entities and consumers ; or

(B)   received less than a reasonably equivalent value in exchange for the transfers; and (i) were insolvent on the date that the transfers were made or became insolvent as a result of such transfers; or (ii) were engaged in business or a transaction, or was about to engage in business or a transaction, for which their remaining assets were unreasonably small in relation to the business or transaction; or (iii) intended to incur, or believed or reasonably should have believed that they would incur, debts beyond their ability to pay as they became due.

WHEREFORE, the Receiver demands judgment against PNC: (i) avoiding the Overdraft Transfers and recovering the amount of those transfers from PNC; (ii) pre-judgment and post-judgment interest as allowed by law; and (iii) such other and further legal and equitable relief as the Court deems just and proper.

**COUNT V**
**Avoidance and Recovery of Fraudulent Transfers**
**Pursuant to Chapter 726 of The Florida Statutes**
*(Transfers to PNC of Deposits to Receivership Bank Accounts)*

97.   The Receiver re-alleges paragraphs 1 through 66 and paragraphs 79 through 80 as if fully set forth herein.

98.   Throughout their banking relationship with PNC, the Receivership Bank Customers received an interest in funds paid by consumers or others for debt relief and related services in connection with the Receivership Entities' debt relief business, and the Receivership Bank Customers thereafter transferred an interest in those funds to PNC by depositing the funds to the PNC Bank Accounts as part of the Receivership Entities' business operations (the

"Deposit Transfers"). As set forth in more detail in the schedule attached hereto as Exhibit "D," Deposit Transfers totaling $32,846,450.01 were made from Receivership Bank Customers to PNC in the course of the banking relationship:

| Receivership Entity Transferor | Amount Transferred |
|---|---|
| 321 Loans, Inc. | $1,152,239.29 |
| Active Debt Solutions, LLC | $4,683,924.89 |
| Aegis Legal Center, LLC | $73,167.80 |
| American Credit Security, LLC | $570,282.61 |
| American Credit Shield, LLC | $6,255.31 |
| Breeze Financial Solutions, Inc. | $22,635.00 |
| Guardian LG, LLC | $1,401,548.79 |
| Halfpay International, LLC | $7,657,461.44 |
| Helping America Group, Inc. | $3,029,085.74 |
| Institute for Financial Freedom, Inc. | $2,907,149.38 |
| Paralegal Staff Support, LLC | $11,191,893.31 |
| US Legal Club, LLC | $150,806.45 |
| **Total** | **$32,846,450.01** |

99.     The Deposit Transfers were made with actual intent to hinder, delay, or defraud creditors of the respective Receivership Bank Customers, namely, to perpetuate the debt relief

scheme so as to continue taking consumers' funds, continue signing up new consumers for the phony debt relief services, and otherwise perpetuate the scheme.

100.     PNC is a transferee of the Deposit Transfers.

101.     As early as July 2014—and absolutely no later than June 2015, the date on which PNC allowed the Receivership Entities back into the bank despite PNC's extensive knowledge of Marcus' improper and fraudulent conduct—PNC was on, at minimum, inquiry notice of Marcus' suspicious, wrongful, fraudulent or criminal activity and had at least constructive knowledge that the transfers were part of Marcus' fraudulent scheme.

102.     Under FUFTA, the Receiver as a creditor may avoid the Deposit Transfers as fraudulent and recover their value from PNC because the Receivership Bank Customers:

(A)   made the Deposit Transfers in the furtherance of a fraudulent scheme or otherwise with actual intent to hinder, delay, or defraud existing or future creditors, including the Receivership Entities and consumers; or

(B)   received less than a reasonably equivalent value in exchange for the transfers; and (i) were insolvent on the date that the transfers were made or became insolvent as a result of such transfers; or (ii) were engaged in business or a transaction, or was about to engage in business or a transaction, for which their remaining assets were unreasonably small in relation to the business or transaction; or (iii) intended to incur, or believed or reasonably should have believed that they would incur, debts beyond their ability to pay as they became due.

WHEREFORE, the Receiver demands judgment against PNC: (i) avoiding the Receivership Deposit Transfers and recovering the amount of those transfers from PNC; (ii) pre-

judgment and post-judgment interest as allowed by law; and (iii) such other and further legal and equitable relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

The Receiver demands a trial by jury as to all facts, issues, and claims that are so triable.

Dated this 3rd day of June, 2019.

GENOVESE JOBLOVE & BATTISTA, P.A.
*Attorneys for Jonathan E. Perlman, Receiver*
100 Southeast 2nd Street, Suite 4400
Miami, Florida  33131
Telephone:  (305) 349-2300
Facsimile:    (305) 349-2310

By:   /s/ Gregory M. Garno
      Gregory M. Garno, Esq., FBN 87505
      ggarno@gjb-law.com
      Michael A. Friedman, Esq., FBN 71828
      mfriedman@gjb-law.com
      W. Barry Blum, Esq., FBN 379301
      bblum@gjb-law.com

10675-609/2959496/4

27