## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

JONATHAN E. PERLMAN, Esq.,
as court appointed Receiver,

     Plaintiff,

       v.

PNC BANK, N.A.,

     Defendant.

Case No. 0:19-cv-61390

## PNC BANK, N.A.'S MOTION TO DISMISS

Peter D. Hardy
   *HardyP@ballardspahr.com*
   (admitted *pro hac vice*)
**Ballard Spahr LLP**
1735 Market Street, 51st Floor
Philadelphia, PA 19103
Telephone:   (215) 864-8838

Peter W. Homer
   *phomer@homerbonner.com*
**Homer Bonner Jacobs, P.A.**
1441 Brickell Avenue
Four Seasons Tower, Suite 1200
Miami, FL 33131
Telephone:   (305) 350-5100
Facsimile:   (305) 372-2738

*Additional Counsel Listed in
Signature Block*

## <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ........................................................................................ iv

I.     INTRODUCTION ........................................................................................... 1

     A.    Background ...................................................................................... 1

     B.    Procedural History ......................................................................... 3

II.    ARGUMENT ................................................................................................. 4

     A.    The Complaint must be dismissed in its entirety because the Receivership Entities are the alter ego of Marcus, authorized all transactions, and are further barred by the doctrine of in pari delicto. .................................. 4

          1.    The Complaint's allegations demonstrate that the Receivership Entities are the alter ego of Marcus and authorized all alleged transactions. ................................................................ 4

          2.    The in pari delicto doctrine bars all claims. ............................... 7

     B.    The Receiver lacks standing to assert FUFTA claims for transactions involving the Receivership Entities. ................................................ 11

          1.    Count V should be dismissed because there is no injury in fact. .............. 12

          2.    Count III should be dismissed because there is no injury in fact. ............. 13

     C.    The Receiver has asserted no claims upon which relief may be granted............. 13

          1.    Counts I and II, alleging aiding and abetting, should be dismissed because PNC lacked actual knowledge of the fraud scheme. .................. 14

               a)    The governing law. ........................................................ 14

               b)    The Complaint's allegations are legally insufficient. .................. 16

                    i.    Alleged "red flags" do not equate to actual knowledge. ................................................ 17

                    ii.    The Complaint's allegations regarding BSA duties do not equate to actual knowledge. ................................... 19

                    iii.    The Complaint's allegations regarding former employee Douglas do not equate to actual knowledge. ........................................................ 20

2.  Counts III and V, FUFTA claims premised on funds transferred to or by Receivership Entities, should be dismissed because PNC was not a party to these transfers. ................................................................. 21

3.  Count IV should be dismissed because it is not sufficiently pled............. 23

   a)  The Receiver has failed to establish fraudulent intent for the Overdraft Transfers. ............................................................... 23

   b)  The Receivership Entities received reasonably equivalent value in exchange for the Overdraft Transfers. ........................... 25

4.  The statute of limitations bars each claim in part. .................................... 26

   a)  Counts I and II. ............................................................................. 26

   b)  Counts III through V. .................................................................... 27

D.  The Complaint should be dismissed because the Receiver lacked authority to commence litigation against PNC.................................................................... 27

III.  CONCLUSION................................................................................................................. 30

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Agape Litig.*,
    773 F. Supp. 2d 298 (E.D.N.Y. 2011) ...................................................................17

*Allerton v. State Dep't of Ins.*,
    635 So.2d 36 (Fla. 1st DCA 1994) .......................................................................15

*AmSouth Bank v. Dale*,
    386 F.3d 763 (6th Cir. 2004) ................................................................................19

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)........................................................................................13, 25

*Ballard v. Royal Tr. Bank*,
    No. 98-55592, 1999 U.S. App. LEXIS 31595 (9th Cir. Nov. 2, 1999) .................19

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007).............................................................................................13

*Ben-Yishay v. Mastercraft Dev., LLC*,
    No. 08-14046-CIV, 2009 U.S. Dist. LEXIS 126874 (S.D. Fla. Dec. 14, 2009)....24

*Bonded Fin. Servs. v. European Am. Bank*,
    838 F.3d 290 (7th Cir. 1988) ...............................................................................22

*Bruhl v. PricewaterhouseCoopers Int'l*,
    No. 03-23044, 2008 U.S. Dist. LEXIS 30962 (S.D. Fla. Mar. 31, 2008)..............15

*Calvert v. Zions Bancorporation (In re Consol. Meridian Funds)*,
    485 B.R. 604 (W.D. Wash. 2013)........................................................................10

*In re Chase & Sanborn Corp.*,
    848 F.2d 1196 (11th Cir. 1988) ...........................................................................22

*City of Miami v. Brooks*,
    70 So. 2d 306 (Fla. 1954).....................................................................................26

*Colliers Lanard & Axilbund v. Lloyds of London*,
    458 F.3d 231 (3d Cir. 2006)..................................................................................15

*Cook v. Roberts (In re Yahweh Ctr., Inc.)*,
    No. 16-4306, 2019 Bankr. LEXIS 885 (Bankr. E.D.N.C. Mar. 22, 2019) .......24, 25

*Cooper v. Meridian Yachts, Ltd.*,
  575 F.3d 1151 (11th Cir. 2009) ................................................................6

*Dep't of Commerce v. New York*,
  --- U.S. ----, --- S. Ct. ----, 2019 U.S. LEXIS 4402 (2019)....................11

*Donnell v. Kowell*,
  533 F.3d 762 (9th Cir. 2008) ..................................................................22

*El Camino Resources, Ltd. v. Huntingdon Nat'l Bank*,
  722 F. Supp. 2d 875 (W.D. Mich. 2010) .................................................20

*Erie R.R. Co. v. Tompkins*,
  304 U.S. 64 (1938)....................................................................................8

*Fed. Trade Comm'n v. Marcus*,
  S.D. Fla. Civil Action No. 17-60907 ............................................... *passim*

*Felman Prod. v. Bannai*,
  No. 3:06-0644, 2007 U.S. LEXIS 81365 (S.D. Va. 2007) ......................10

*Feltman v. Prudential Bache Securities*,
  122 B.R. 466 (S.D. Fla. 1990) ..................................................................9

*Freeman v. Dean Witter Reynolds, Inc.*,
  865 So.2d 543 (Fla. 2d DCA 2003) .......................................................8, 9

*Freeman, v. First Union Nat'l Bank*,
  865 So.2d 1272 (Fla. 2004).....................................................................22

*Galindo v. ARI Mut. Ins. Co.*,
  203 F.3d 771 (11th Cir. 2000) ..................................................................8

*GLK, L.P. v. Four Seasons Hotel Ltd.*,
  22 So. 3d 635 (Fla. 3d DCA 2009) .........................................................27

*Graves v. Plaza Med. Ctrs., Corp.*,
  No. 10-23382-CIV, 2017 U.S. Dist. LEXIS 28049 (S.D. Fla. Feb. 27, 2017) .......15

*Green v. Stuart*,
  135 F.2d 33 (5th Cir. 1943) ....................................................................12

*Helf v. Chevron U.S.A. Inc.*,
  361 P.3d 63 (Utah 2015)..........................................................................15

*Home Fed. Sav. & Loan Ass'n of Hollywood v. Emile*,
  216 So. 2d 443 (Fla. 1968).......................................................................19

*Hynd v. Ireland,*
    582 So. 2d 772 (Fla. 4th DCA 1991) ................................................................26

*Isaiah v. JPMorgan Chase Bank, N.A.,*
    No. 16-21771, 2017 U.S. Dist. LEXIS 190051 (S.D. Fla. Nov. 14, 2017) .................... *passim*

*James v. Heritage Valley Fed. Cred. Union,*
    197 F. App'x 102 (3d Cir. 2006) ........................................................19

*Knauer v. Jonathon Roberts Fin. Group, Inc.,*
    348 F.3d 230 (7th Cir. 2003) ....................................................7, 8, 12

*Lamm v. State Bank & Tr.,*
    749 F.3d 938 (11th Cir. 2014) ..........................................................19

*Lawrence v. Bank of Am., N.A.,*
    455 F. App'x 904 (11th Cir. 2012) ..................................13, 15, 18, 19

*Litson-Gruenberg v. JPMorgan Chase & Co.,*
    No. 09-56, 2009 U.S. Dist. LEXIS 117749 (N.D. Tex. Dec. 16, 2009) ................................17

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) ...............................................................11, 12

*In re Managed Care Litig.,*
    430 F. Supp. 2d 1336 (S.D. Fla. 2006) ..........................................15, 21

*Marchak v. JPMorgan Chase & Co.,*
    No. 15-cv-4297, 2016 U.S. Dist. LEXIS 92995 (E.D.N.Y. Jul. 15, 2016) ...........................19

*McCoy v. Durden,*
    155 So.3d 399 (Fla. 1st DCA 2014) ................................................10

*Meridian Trust Co. v. Batista,*
    No. 17-23051-WILLIAMS, 2018 U.S. Dist. LEXIS 166556 (S.D. Fla. Sept.
    24, 2018) ..........................................................................22, 24

*Mw. Cattle Mktg., LLC v. Legend Bank, N.A.,*
    No. 17-375, 2018 WL 2244339 (N.D. Tex. May 16, 2018) ....................................15

*O'Halloran v. First Union Nat'l Bank of Fla.,*
    350 F.3d 1197 (11th Cir. 2003) ................................................6, 7, 19

*O'Halloran v. PricewaterhouseCoopers LLP,*
    969 So.2d 1039 (Fla. 2d DCA 2007) ...................................................7

*Oginsky v. Paragon Properties of Costa Rica LLC,*
    784 F. Supp. 2d 1353 (S.D. Fla. 2011) ..............................................24

*Perlman v. Bank of Am., N.A.*,
   No. 11-80331, 2011 U.S. Dist. LEXIS 161084 (S.D. Fla. Dec. 21, 2013) ............................ 15

*Perlman v. Bank of Am., N.A.*,
   No. 11-80331, 2014 U.S. Dist. LEXIS 193658 (S.D. Fla. Sept. 19, 2014) ...................... 14, 21

*Perlman v. Wells Fargo Bank, N.A.*,
   559 F. App'x 988 (11th Cir. 2014) (per curiam) ............................................. *passim*

*Pinter v. Dahl*,
   486 U.S 622 (1988) .......................................................................................... 7

*Platinum Estates, Inc. v. TD Bank, N.A.*,
   No. 11-60670-CIV, 2012 U.S. Dist. LEXIS 30684 (S.D. Fla. Mar. 7, 2012) ...................... 16

*Quinn v. Phipps*,
   93 Fla. 805 (Fla. 1927) .................................................................................. 10

*Scholes v. Lehman*,
   56 F.3d 750 (7th Cir. 1995) ................................................................... 4, 7, 8, 9

*Se. Waffles, LLC v. United States Dep't of Treasury/IRS (In re Se. Waffles, LLC)*,
   460 B.R. 132 (B.A.P. 6th Cir. 2011) ................................................................... 26

*SEC v. Elmas Trading Corp.*,
   620 F. Supp. 231 (D. Nev. 1985) ........................................................................ 4

*SEC v. Monterosso*,
   No. 07-61693, 2011 U.S. Dist. LEXIS 163242 (S.D. Fla. Mar. 8, 2011) ............................. 6

*SEC v. Nadel*,
   No. 09-8726, 2012 U.S. Dist. LEXIS 189560 (M.D. Fla. Apr. 25, 2012) ............................ 29

*SEC v. Torchia*,
   No. 15-3904, 2016 U.S. Dist. LEXIS 147123 (N.D. Ga. Oct. 25, 2016) ....................... 4, 5, 6

*Silverman Ptnrs., L.P. v. First Bank*,
   687 F. Supp. 2d 269 (E.D.N.Y. 2010) ................................................................. 20

*Special Purpose Accounts Receivable Co-op.*
   *Corp.*, No. 06-61055-CIV-MORENO, 2007 U.S. Dist. LEXIS 70886 (S.D.
   Fla. Sept. 25, 2007) ..................................................................................... 24

*Spokeo, Inc. v. Robins*,
   578 U.S. ----, 136 S. Ct. 1540 (2016) ................................................................ 11

*Super Vision Int'l, Inc. v. Mega Int'l Commercial Bank Co.,*
    534 F. Supp. 2d 1326 (S.D. Fla. 2008), *aff'd*, No. 08-15031, 2009 U.S. App.
    LEXIS 8089 (11th Cir. Apr. 17, 2009) (*per curiam*)..............................................22

*Taylor v. Am. Chemistry Council,*
    576 F.3d 16 (1st Cir. 2009).........................................................................15, 21

*Taylor v. KeyCorp,*
    680 F.3d 609 (6th Cir. 2012) ...........................................................................12

*Towne Auto Sales v. Tobsal Corp.,*
    2017 U.S. Dist. LEXIS 187990, Case: 1:16-cv-02739-CAB (N.D. Ohio Nov.
    14, 2017) .........................................................................................................20

*Trumpet Vine Invs., N.V. v. Union Capital Partners I, Inc.,*
    92 F.3d 1110 (11th Cir. 1996) ...........................................................................8

*United Mine Workers v. Gibbs,*
    383 U.S. 715 (1966)..........................................................................................8

*United States v. Air Fla., Inc.,*
    534 F. Supp. 17 (S.D. Fla. 1982) ....................................................................13

*Vasquez v. H.K. & Shanghai Banking Corp.,*
    18 Civ. 1876 (PAE), 2019 U.S. Dist. LEXIS 90716 (S.D. N.Y. May 29, 2019)....................14

*Viacom Int'l, Inc. v. YouTube, Inc.,*
    676 F.3d 19 (2d Cir. 2012).............................................................................15

*Walker v. Hallmark Bank & Trust, Ltd.,*
    707 F. Supp. 2d 1317 (S.D. Fla. 2010) ..........................................................22

*Welch v. Regions Bank (In re Mongelluzzi),*
    591 B.R. 480 (Bankr. S.D. Fla. 2018)....................................................22, 23, 25

*Wiand v. Lee,*
    753 F.3d 1194 (11th Cir. 2014) .....................................................................4, 8

*Wiand v. Mason,*
    2012 U.S. Dist. LEXIS 185133 (M.D. Fla. Dec. 17, 2012)....................................27

*Wiand v. Sarasota Opera Ass'n,*
    No. 10-248, 2011 U.S. Dist. LEXIS 109203 (M.D. Fla. Sept. 26, 2011)...............27

*Wiand v. Wells Fargo Bank, N.A.,*
    86 F. Supp. 3d 1316 (M.D. Fla. 2015) ....................................................20, 22, 23

*Wiand v. Wells Fargo Bank, N.A.*,
 938 F. Supp.2d 1238 (M.D. Fla. 2013) ........................................................................15, 19, 21

*In re Wilmington Trust Corp. ERISA Litig.*,
 943 F. Supp. 2d 478 (D. Del. 2013) ..................................................................................12

**Statutes**

31 U.S.C. § 5311 .....................................................................................................................14

Fla. Stat. § 95.11(3)(o) ............................................................................................................26

Fla. Stat. § 725.109(1) .............................................................................................................25

Fla. Stat. § 726.102(14) ...........................................................................................................21

Fla. Stat. § 726.104(1) .............................................................................................................25

Fla. Stat. § 726.105 ...........................................................................................................23, 24, 25

Fla. Stat. § 726.106(1) ......................................................................................................23, 25

Fla. Stat. § 726.108(1)(b) ........................................................................................................21

Fla. Stat. § 726.110 .................................................................................................................27

UCC § 9-102(42) .....................................................................................................................28

**Rules**

Fed. R. Civ. P. 8(a) ...................................................................................................13, 14, 17, 24

Fed. R. Civ. P. 9(b) ...................................................................................................14, 17, 24

Fed. R. Civ. P. 12(b)(1) .............................................................................................................1

Fed. R. Civ. P. 12(b)(6) ........................................................................................................1, 13

S.D. Fla. L.R. 7.1 ................................................................................................................1, 30

Pursuant to Federal Rule of Civil Procedure 12(b)(1), (6) and S.D. Fla. L.R. 7.1, Defendant PNC Bank, N.A. ("PNC") requests dismissal with prejudice of the Complaint filed by Plaintiff, Jonathan E. Perlman (the "Receiver").

## I.    INTRODUCTION

### A.    <u>Background</u>

An over-reaching Receiver has belatedly filed a partially time-barred case against PNC asserting baseless claims that he has neither standing nor Court authority to bring.  Even when read in the manner most favorable to the Receiver, the Complaint makes clear that PNC had no knowledge of the underlying consumer fraud scheme alleged to have been committed by a former customer, and certainly lacked any intent to further any such scheme.  Further, PNC did not obtain or retain any pay-outs of scheme funds from the Receivership Entities – indeed, it received no funds at all other than customary bank fees charged in the ordinary course of business.  Nonetheless, the Receiver brings this action, not on behalf of defrauded consumers (which he would have no standing to do), but instead purportedly by "standing in the shoes" of entities that, based on the Receiver's own admissions, were nothing but the instruments of a fraud scheme and the "alter ego" of the wrongdoer.  These same entities authorized all transactions at issue, and could not therefore have suffered any cognizable injury.

On June 3, 2019, the Receiver filed the instant action against PNC.[1]  The Complaint asserts common law claims for allegedly aiding and abetting Marcus's tortious acts: specifically, his breach of fiduciary duties owed to the Receivership Entities, and his related conversion of the Receivership Entities' funds for his personal use, based on the facts of Marcus's alleged underlying consumer fraud scheme.  *See id.* at ¶¶ 67-76 (alleging Counts One and Two, respectively).  The Complaint also alleges three claims under Florida's Uniform Fraudulent Transfer Act ("FUFTA"), seeking avoidance of: (1) Marcus-initiated transfers between

---

[1]    Footnote five of the Complaint asserts that PNC's response to a third-party subpoena for documents issued by the Receiver "is the subject of a pending motion to compel and for sanctions" in the Receivership Action, and that PNC's conduct regarding the subpoena "speaks volumes about PNC's level of knowledge of Marcus's illegal and fraudulent conduct."  Despite the Receiver's high-charged rhetoric and accusations used in this footnote, U.S. Magistrate Judge Barry S. Seltzer held a hearing on June 5, 2019 on the Receiver's motion to compel and for sanctions, and issued a Report and Recommendation on June 11, 2019 denying the Receiver's motion in its entirety.  S.D. Fla. Civil Action No. 17-60907, ECF. No. 380.

Receivership Entities (the "Intercompany Transfers"); (2) dollar-for-dollar overdraft repayments and related bank fees that the Receivership Entities remitted to PNC (the "Overdraft Transfers"); and (3) funds that had been deposited *into* the Receivership Entities' bank accounts (the "Deposit Transfers"). *See id.* at ¶¶ 77-102 (alleging Counts Three to Five, respectively).

However, the Receiver's 27-page Complaint, accompanied by nearly 200 pages of exhibits, fails to plead facially plausible claims against PNC. To the contrary, every claim should be dismissed because the Complaint concedes that the Receivership Entities, on whose behalf the Receiver is suing, were merely the alter ego of Marcus and therefore cannot raise any cognizable claims against PNC because: (1) the Receivership Entities themselves authorized Marcus to conduct each of the financial transactions involving PNC (which support each count); and (2) the doctrine of *in pari delicto* bars any claims by the Receivership Entities because, as the alter ego of Marcus, they come to the Court with unclean hands and therefore cannot obtain redress from PNC.

Further, the Receivership Entities have not suffered any injury sufficient to confer Article III standing to pursue the FUFTA claim alleged in Count III because the Intercompany Transfers represent money moving from the "left hand" to the "right hand" of a common enterprise. Nor have the Receivership Entities suffered any cognizable Article III injury to pursue the FUFTA claim alleged in Count V because the alleged deposits enriched the Receivership Entities, rather than harming them. Counts III and V also should be dismissed, on the related basis of FUFTA's statutory requirements, because the transactions do not constitute "transfers" for the purposes of FUFTA. And Count IV should be dismissed because the allegations demonstrate that the Receivership Entities did not receive less than "reasonably equivalent value" in exchange for the Overdraft Transfers, as required by FUFTA.

Counts I and II should be dismissed because the allegations fail to plausibly demonstrate that PNC possessed actual knowledge of, and the specific intent to aid and abet, either Marcus's alleged breach of fiduciary duties that he owed to the Receivership Entities, or Marcus's alleged conversion/misappropriation of the entities' funds for personal use. The case law squarely rejects the Receiver's efforts to demonstrate actual knowledge based on alleged "red flags."

Additionally, each Count should be dismissed insofar as it relies on transactions and conduct outside of the applicable four-year statute of limitation. Specifically, this action was commenced on June 3, 2019 and is based in significant part on account activity for certain

Receivership Entities that occurred only from January 2014 through January 2015—after which there was a complete break in activity and new account activity for totally different Receivership Entities beginning in June 2015.  The statute of limitations therefore bars any claims that pertain to the 2014 and early 2015 transactions, which are specified by date in the detailed spreadsheets attached to the Complaint.

Finally, the entire Complaint should be dismissed because the Order appointing the Receiver and establishing his limited powers did not authorize him to file commercial tort claims against any third-parties such as PNC in the absence of Court authorization.  Nonetheless, the Receiver failed to obtain specific Court authority and every claim against PNC is a commercial tort claim against a third party.  The Receiver failed to obtain such Court authority even though he previously acknowledged in written pleadings that he was required to do so.

**B.** __Procedural History__

This case is ancillary to an enforcement receivership action brought by the Federal Trade Commission (the "FTC") and the State of Florida (the "State").  On May 8, 2017, the FTC and State filed suit against Jeremy Marcus and others, asserting that Marcus, through a litany of entities he controlled, defrauded consumers in a debt relief scam.  *See Fed. Trade Comm'n v. Marcus*, S.D. Fla. Civil Action No. 17-60907 (the "Receivership Action"), pending before Judge Federico A. Moreno.  *See* Compl. ¶ 1.  The FTC and the State also simultaneously sought an *ex parte* temporary restraining order, a freeze of the defendants' assets, and the appointment of Jonathan Perlman as Receiver over Marcus and his entities ("Receivership Entities").[2]  *See* Receivership Action, Motion for Temporary Restraining Order with Asset Freeze, Appointment of a Receiver, etc., ECF No. 6.  The Court appointed Perlman as the permanent Receiver on May 17, 2017.  *See* Receivership Action, Preliminary Injunction Order, ECF No. 21, at pp. 17-20.

The Receivership Action has been pending for over two years. Judge Moreno administratively closed the case on March 26, 2018, and shortly thereafter, the FTC and State obtained a Stipulated Order for Injunction and Monetary Judgment against Marcus and the other defendants.  *See* Receivership Action, ECF Nos. 227, 231, 232.

---

[2]     The term "Receivership Entities" is defined in the Complaint, at page 1, footnote 1.

## II.     ARGUMENT

### A.     The Complaint must be dismissed in its entirety because the Receivership Entities are the alter ego of Marcus, authorized all transactions, and are further barred by the doctrine of *in pari delicto.*

Because the Complaint makes clear that the Receivership Entities operated merely as the alter ego of Marcus, and existed only to perpetrate a fraudulent scheme, the Receiver cannot prevail on any of his claims since:  (1) the Receivership Entities fully authorized Marcus to act on their behalf for the purposes of the banking transactions with PNC upon which every Count is based; and (2) the Receivership Entities come to the Court with "unclean hands" and therefore are barred from asserting any claims under the doctrine of *in pari delicto.*

#### 1.     The Complaint's allegations demonstrate that the Receivership Entities are the alter ego of Marcus and authorized all alleged transactions.

It is well-settled that the Receiver "stands in the shoes" of the Receivership Entities, and may bring only the claims of those entities.  *See Wiand v. Lee*, 753 F.3d 1194, 1202 (11th Cir. 2014) (citing *Scholes v. Lehman*, 56 F.3d 750 (7th Cir. 1995)).  He cannot prosecute claims belonging to defrauded consumers.  *See id.*  However, as detailed below, the Complaint indisputably alleges facts demonstrating that each Receivership Entity was merely the alter ego of the alleged fraudster, Marcus.

In the receivership context, courts have determined the existence of alter ego relationships by examining several factors, including:

> the comingling of funds and other assets; the unauthorized diversion of funds or assets to other than corporate purposes; the treatment by an individual of corporate assets as his own; the failure to maintain minutes or adequate corporate records and the confusion of the records of the separate entities; the identity of equitable ownership in the two entities; the identity of the officers and directors of the two entities, or of the supervision and management; the absence of corporate assets; [and] the use of a corporation as a mere shell, instrumentality or conduit for a single venture or the business of an individual or another corporation . . . .

*SEC v. Torchia*, No. 15-3904, 2016 U.S. Dist. LEXIS 147123, at *10-11 (N.D. Ga. Oct. 25, 2016) (block-quoting *SEC v. Elmas Trading Corp.*, 620 F. Supp. 231, 234 (D. Nev. 1985)). The alter ego doctrine "is not applied to eliminate the consequences of corporate operations, but to avoid inequitable results." *Elmas*, 620 F. Supp. at 233.

The facts alleged in the Complaint and the Receiver's admissions in other public court filings satisfy these factors.  Notably, the Receiver alleges in the Complaint that "[i]n reality, all entities operated for Marcus' personal benefit or profit and were essentially engaged in the business of thievery."  Compl. ¶ 11.  The Receiver also alleges that the Receivership Entities' funds were comingled; that those funds were diverted for unauthorized use; that the Receivership Entities were owned, supervised, and controlled by the same individuals; and that the Receivership Entities were, in effect, the conduit through which Jeremy Marcus orchestrated his fraudulent scheme.  *See id.* at ¶¶ 10-11, 16, 18, 50, 74, 79-86.  Those facts indisputably support a finding of alter ego relationships between the various Receivership Entities and Marcus.  *See Torchia*, 2016 U.S. Dist. LEXIS 147123, at *10-11.

While the Receiver's Complaint alone demonstrates that each Receivership Entity is the alter ego of the others and of Marcus, this conclusion is further buttressed by the Receiver's admissions in other public filings in the underlying Receivership Action:

- "The [Receivership] entities commingled and moved monies amongst each other, at Mr. Marcus' direction, without regard to corporate formality."  (Hardy Decl., Ex. A, Receiver's 1st Verified Mot. to Expand Receivership, 4).

- "Marcus owned and/or controlled the [Receivership Entities and] additional [receivership] entities as part of the Defendants' consumer debt relief business. The entities share common management and employees, ***all of whom answered to Marcus***.  Marcus also created additional affiliated entities to which he transferred in excess of $20 million that originated from consumers. These entities too were headquartered at the Pompano Headquarters, utilized common employees, as well as common third-party professionals, all of whom were paid from monies received from consumers."  (*Id.* (emphasis added).)

-  The Receivership Entities acted in concert, as part of a "common enterprise" that "operat[ed] as an integrated network of companies with common owners, operators, employees, locations, and shared funds."  (*Ibid*.)

- The Receivership Entities "trade[d] funds freely and move[d] money through their accounts."  (Hardy Decl., Ex. B, 1st Am. Compl. in Receivership Action, ¶¶ 8, 42.)

- "The [Receivership Entities] are operating as a common enterprise while engaging in . . . deceptive and unlawful acts and practices . . . . [They] are conducting [those] business practices . . . through an interrelated network of companies that have common officers, managers, business functions, employees, or office locations, and they have commingled funds."  (Hardy Decl., Ex. A, Receiver's 1st Verified Mot. to Expand Receivership, 9 ("Though separate in name, the various entities operated from the same room, utilizing common employees and the same [software].").)

Because the Receivership Entities operated as the alter ego of Marcus, the Receiver cannot prevail on any of his claims because the entities fully authorized Marcus to act on their behalf for the purposes of their banking transactions with PNC.  *See Torchia*, 2016 U.S. Dist. LEXIS 147123, at *9 ("The Court has broad powers to determine what relief is appropriate in an equity receivership.") (citing *SEC v. Elliott*, 953 F.2d 1560, 1566 (11th Cir. 1992)).[3]

This case is controlled by *O'Halloran v. First Union Nat'l Bank of Fla.*, 350 F.3d 1197 (11th Cir. 2003).  In *O'Halloran*, a debtor entity was alleged to have operated a Ponzi scheme and maintained some of the proceeds in an account with defendant First Union. The Eleventh Circuit found that a bankruptcy trustee failed to state *any* claim against First Union on behalf of the debtor estate because, even after construing the complaint in the light most favorable to the trustee, the fraudster was "fully authorized" by the receivership entity to act on its behalf.  *Id*. at 1206.  The Court determined that "we agree with First Union that these allegations foreclose the possibility of the trustee's prevailing on any of his theories." *Id*. The Court went on to state that, "[i]f indeed [the fraudster] had complete and legal authorization from [the receivership entity], as alleged by the Complaint, First Union is not responsible for [the fraudster's] diverting the funds to his own purposes.  Such allegations foreclose the possibility that First Union was responsible to [the receivership entity] for the [fraudster's] withdrawals, and dismissal of this claim was appropriate." *Id*.

*O'Halloran* represents binding Eleventh Circuit precedent, and it has not been abrogated. *O'Halloran* applies precisely to this Complaint because each and every count rests on a series of alleged transactions conducted by, or at the direction of, Marcus, who was in control of the entities.  *See also* Compl. ¶¶ 53(c) (alleging that "Marcus remained the person in control of the Receivership Entities after having nominally ceded control to Craig Smith.")  Additionally, the *O'Halloran* decision is based upon allegations of misuse of corporate formalities giving rise to an alter ego relationship, and is not dependent on the allegations of fraud *per se*, and therefore is distinct from the in *pari delicto* doctrine, discussed *infra*.  In other words, the Eleventh Circuit in

---

[3]     Those admissions, pleaded in the underlying Receivership Action, are binding upon the Receiver; he cannot controvert them in any manner, no matter their legal effect.  *See Cooper v. Meridian Yachts, Ltd.*, 575 F.3d 1151, 1177-78 (11th Cir. 2009); *see also SEC v. Monterosso*, No. 07-61693, 2011 U.S. Dist. LEXIS 163242, at *8-10 (S.D. Fla. Mar. 8, 2011) (striking portions of pleading that contradicted earlier judicial admissions).

*O'Halloran* determined that the trustee failed to state a claim due to the use of entities without regard to their distinct corporate identities, and because the entities authorized the movement of money among their various accounts with First Union. The Eleventh Circuit did not rely on the fraudulent acts themselves or weigh the fault as between First Union and the fraudster's entities. Accordingly, based on *O'Halloran*, the entire Complaint should be dismissed.

> ### 2.    The *in pari delicto* doctrine bars all claims.

The second consequence of the Receiver's allegations that the Receivership Entities operated as the alter ego of Marcus is that the Receiver is also barred from bringing all of the claims under the doctrine of *in pari delicto*. "The equitable defense of *in pari delicto*, meaning 'in equal fault,' is rooted in common-law notion that a plaintiff's recovery may be barred by his own wrongful conduct." *Pinter v. Dahl*, 486 U.S 622, 632 (1988). "Broadly speaking, the [*in pari delicto* doctrine] prohibits plaintiffs from recovering damages from their own wrongdoing. . . . The universal rule of our law is that one in a court of justice cannot complain. . . of another's wrong whereof he was a partaker. . . . The *in pari delicto* doctrine is a corollary of the doctrine of unclean hands which requires that no one shall be permitted to profit from his own fraud or wrongdoing, and that one who seeks the aid of equity must do so with clean hands." *O'Halloran v. PricewaterhouseCoopers LLP*, 969 So. 2d 1039, 1044 (Fla. 2d DCA 2007) (citations and quotation marks omitted).

*Knauer v. Jonathon Roberts Fin. Group, Inc.*, 348 F.3d 230 (7th Cir. 2003) is highly instructive. There, the court upheld dismissal of a receiver's claims, holding that the *in pari delicto* doctrine barred the receiver from pursuing losses caused by the receivership entities. In *Knauer*, a receiver sued defendant broker-dealers asserting claims for breach of fiduciary duty, fraud, and negligent supervision, all relating to a Ponzi scheme. *Id*. at 232. The receiver alleged that the broker-dealers were in part responsible for losses sustained by the receivership entities. The court found, however, that the complaint demonstrated that the entities had "fault at least equal to that of the broker dealers," were "very much at the forefront of the Ponzi scheme," and that "the defendants' involvement in the Ponzi scheme was quite minor." *Id*. at 237.

The *Knauer* court discussed in detail and distinguished an earlier Seventh Circuit decision, *Scholes v. Lehmann*, 56 F.3d 750 (7th Cir. 1995). *Scholes* was a "clawback" action where the Receiver attempted to recover funds from defendants who allegedly should not have received them. *Knauer*, 348 F.3d at 235. The *Scholes* court ruled that under those circumstances

the *in pari delicto* doctrine did not bar the receiver's claims. *Knauer* distinguished those facts reasoning that "the key difference for purposes of equity, between fraudulent conveyance cases such as *Scholes* and the instant case is the identities of the defendants. The receiver here is not seeking to recover the diverted funds from the beneficiaries of the diversions . . . . ***Rather, this is a claim for tort damages from entities that derived no benefit from the embezzlements, but that were allegedly partly to blame for their occurrence.*** In the equitable balancing before us, we find *Scholes* less pertinent than the general. . . rule that the receiver stands precisely in the shoes of the corporations for which he has been appointed." 348 F.3d at 236 (emphasis added). The Complaint here aligns with *Knauer*, which resulted in dismissal, rather than *Scholes*.[4]

The Florida Second District Court of Appeal, in *Freeman v. Dean Witter Reynolds, Inc.*, 865 So. 2d 543, 552 (Fla. 2d DCA 2003), has adopted the distinction between *Scholes* and *Knauer* urged here.[5] In *Freeman*, a receiver for a financial services corporation alleged that

---

[4]     The distinction between *Scholes* and *Knauer* is important because the limited holding in *Scholes* was relied upon by the Eleventh Circuit in *Wiand v. Lee*, 753 F.3d 1194 (11th Cir. 2014). *Wiand* held that a receiver had standing to bring a clawback action against a defendant who had received custody over receivership funds. 753 F.3d at 1202-03. First, *Wiand* involved the issue of Article III standing, and did not even discuss the distinct doctrine of *in pari delicto* at issue in *Knauer* and *Scholes*. *Id.* at 1202-03. Second, as in *Scholes*, *Wiand* was a clawback action against a "winner" in a Ponzi scheme where the receiver sought to clawback profits received by the defendant, a former investor in the scheme. Significantly, in *Wiand*, the distributions received by the defendants were \$935,631.51 in excess of their investments. *Id.* at 1198. That is not the case here. *Wiand's* adoption of *Scholes'* rationale was limited to its precise facts and rationale. *Wiand* should be recognized as similarly limited within the Eleventh Circuit.

[5]     Because the Receiver has asserted state law claims against PNC, Florida state law controls under the *Erie* doctrine. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938) ("[e]xcept in matters governed by the Federal Constitution or by Acts of Congress, the law to be applied in any case is the law of the State."); *see also United Mine Workers v. Gibbs*, 383 U.S. 715 (1966). In *McMahan v. Toto*, the Eleventh Circuit acknowledged that "absent a decision from the state supreme court on an issue of state law, we are bound to follow decisions of the state's intermediate appellate courts unless there is some persuasive indication that the highest court of the state would decide the issue differently." 311 F.3d 1077, 1080 (11th Cir. 2002); *see also Galindo v. ARI Mut. Ins. Co.*, 203 F.3d 771, 775 (11th Cir. 2000); *Trumpet Vine Invs., N.V. v. Union Capital Partners I, Inc.*, 92 F.3d 1110, 1120 (11th Cir. 1996). The Eleventh Circuit further recognized that in Florida, "'the decisions of the district courts of appeal represent the law of Florida unless and until they are overruled by [the Florida Supreme Court].'" *McMahan*, 311 F.3d at 1080 (quoting *Pardo v. State*, 596 So. 2d 665, 666 (Fla. 1992) (further quotations and citations omitted). Because the Florida Supreme Court has not overruled the intermediate appellate court in *Freeman*, its analysis is binding here. *Id.*

defendants were liable for the economic losses that either the corporation or its customers suffered because of a Ponzi scheme. *Id.* The *Freeman* court acknowledged *Scholes* but noted that federal courts in the Southern District of Florida took a "less forgiving approach" to entity claims. *See id.* (citing *Feltman v. Prudential Bache Securities*, 122 B.R. 466, 473-75 (S.D. Fla. 1990) (holding that bankruptcy trustee could not pursue claims for aiding and abetting theft, negligence, and participating in a breach of fiduciary duty in part because the entities were "sham corporations, alter egos with no corporate identity separate from" the fraudster, and any alleged injury to the debtor corporations "is as illusory as was their corporate identity")).

The *Freeman* court sought to reconcile *Scholes* and *Feltman*, noting that there is a fundamental difference in the two kinds of claims at issue in those cases: *i.e.*, (1) actions in which a corporation in receivership, "cleansed" through that receivership, may assert claims directly against the principals or recipients of fraudulent transfers of corporate funds to recover assets belonging to the corporation that were taken prior to the receivership (the *Scholes* claims); and (2) common law tort claims against third parties to recover damages in the name or shoes of the corporation for fraud perpetrated by the corporation's insiders (the *Feltman* claims). *See* 865 So. 2d at 551. Significantly, the *Freeman* court held that "[w]hen the entities in receivership do not include a corporation that has at least one honest member of the board of directors or an innocent stockholder, we do not perceive a method to separate the fraud and intentional torts of the insiders from those of the corporation itself." *Id.* That court explained:

> Although the receivership may "cleanse" the corporation, it cannot alter historical facts. In this case, [the receivership entity] was controlled exclusively by persons engaging in its fraudulent scheme and benefitting from it. [The receivership entity] was not a large corporation with an honest board of directors and multiple shareholders, suffering from the criminal acts of a few rogue employees in a regional office. It is clear from the allegations of the amended complaint that it was created by the [fraudsters] to dupe the customers. This corporation was entirely the robot or the evil zombie of the corporate insiders.

*Id.* The court recognized that "[t]he distinction between an honest corporation with rogue employees, which can pursue claims for the fraud or intentional torts of third parties while in receivership, and a sham corporation created as the centerpiece of a Ponzi scheme, which cannot pursue such claims is both a legal and a practical distinction." *Id.* at 552.

Thus, under *Freeman*, all claims asserted in this case are barred. First, the Receiver's claims are akin to those asserted in *Feltman*—they are FUFTA and common law tort claims that

have been asserted against a third party (PNC) to recover alleged damages that the Receivership Entities suffered as the result of a fraud orchestrated by an insider (Marcus) of the Entities.  The Receiver has not asserted claims against any entity that received custody and control over any of the Receivership Entities' funds, regardless of whether any of the funds represented embezzlements or improper diversions by Marcus.  Second, as detailed above, the Complaint concedes that the Receivership Entities are nothing more than a series of sham corporations created to further Marcus's fraudulent scheme.  The Complaint is devoid of any allegation that the Receivership Entities had honest third party insiders, such as a directors, corporate officers, or even shareholders—except for the Receiver, who was not present at the time of loss.  To the contrary, the Complaint unequivocally establishes that the Receivership Entities were created by Marcus solely to dupe his customers for his benefit.  Compl. ¶ 11.  Third, the allegations in the Complaint demonstrate that Marcus's and the Receivership Entities' conduct was far more egregious than any alleged conduct by PNC.  *Compare* Compl. ¶¶ 4, 10-20, *with* Compl. ¶¶ 21-23, 27-35, 35-59.  Because the Receivership Entities' fault rises so far beyond the alleged fault of PNC, this Court should apply the *in pari delicto* doctrine to every claim and dismiss the Complaint.

Finally, the *in pari delicto* doctrine requires dismissal of Count I for one last reason. Count I alleges PNC aided and abetted Marcus's breach of fiduciary duties to the Receivership Entities.  It is impossible, however, for a fraudster to breach fiduciary duties to companies that are merely his own alter ego.  The law imposes a fiduciary duty on certain relationships based on their historical nature, such as attorney-client, doctor-patient, partner-partner.  In Florida, fiduciary duties have their origin in equity.  *Quinn v. Phipps*, 93 Fla. 805, 809-810 (Fla. 1927). The rule embraces "both technical fiduciary relations and those informal relations which exist wherever one man trusts in and relies upon another."  *McCoy v. Durden*, 155 So. 3d 399, 402-403 (Fla. 1st DCA 2014); *see also Calvert v. Zions Bancorporation (In re Consol. Meridian Funds)*, 485 B.R. 604, 620 (W.D. Wash. 2013).  Certainly, a fraudster's relationship with an entity he created to perpetrate his fraud is not one of those relationships.  It would be absurd to assert that the relationship between Marcus and the entities he created was based on trust, reliance, or confidence—it was not—because there was no one involved but Marcus and no purpose other than fraud.  *See Felman Prod. v. Bannai*, No. 3:06-0644, 2007 U.S. LEXIS 81365, at *28 (S.D. Va. 2007) (corporation cannot owe a fiduciary duty to itself).  It would be

inequitable to permit the Receiver to now claim that Marcus owed any duty at all to the Receivership Entities, which furthered Marcus's fraudulent acts and now come to the Court with unclean hands.  Because corporations must act through their officers, directors, employees, and agents, the entities bear the same culpability as Marcus and their "unclean hands" bar any such claims.

Accordingly, the Court should hold that the Complaint's allegations require dismissal of all claims under the *in pari delicto* doctrine.

### B.   The Receiver lacks standing to assert FUFTA claims for transactions involving the Receivership Entities.

Counts III and V also should be dismissed in the alternative for lack of Constitutional standing.  Specifically, the Receiver lacks standing to assert Count III (for avoidance of the Intercompany Transfers) or Count V (for avoidance of the Deposit Transfers) because he has not (and cannot) plausibly plead any harm to the Receivership Entities from the Intercompany Transfers, where each Receivership Entity was the alter ego of the other, or the Deposit Transfers, where the Receivership Entities *received* funds.  Put simply, there has been no "injury in fact."

Article III standing is an "irreducible constitutional minimum" of federal jurisdiction that "limits the categories of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong."  *Spokeo, Inc. v. Robins*, 578 U.S. ----, 136 S. Ct. 1540, 1547 (2016).  It has three elements.  "First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical.  Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.  Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (citations, quotation marks, and alterations omitted); *see also Dep't of Commerce v. New York*, --- U.S. ----, --- S. Ct. ----, 2019 U.S. LEXIS 4402, at *22 (2019).  "The party invoking federal jurisdiction bears the burden of establishing these elements."  *Lujan*, 504 U.S. at 561; *see also Spokeo*, 136 S. Ct. at 1547 ("Where, as here, a case is at the pleading stage, the plaintiff must clearly allege facts demonstrating each element.").  "[T]he 'injury in fact' test requires more than an injury to a

11

cognizable interest. It requires that the party seeking review [is] himself among the injured."
*Lujan*, 504 U.S. at 561.

### 1. Count V should be dismissed because there is no injury in fact.

There has been no injury in fact, and the Receiver lacks standing to assert Count V
because the Receivership Entities were not injured by the Deposit Transfers into the
Receivership Entities' accounts.

In support of Count V, the Receiver alleges that the Receivership Entities "received an
interest in funds paid by consumers or others for debt relief and related services in connection
with [their] debt relief business . . . ."  Compl., ¶ 98.  That allegation unequivocally demonstrates
that the Receivership Entities were the recipients of, and thereby ***benefited*** from, the Deposit
Transfers.  The Receivership Entities were beneficiaries of those transactions, so the Receiver
lacks standing to avoid them.  *See Knauer v. Jonathon Roberts Finn. Group, Inc.*, 348 F.3d 230,
234 (7th Cir. 2003); *see also Taylor v. KeyCorp*, 680 F.3d 609, 613 (6th Cir. 2012) (standing is
lacking where the plaintiff actually receives a benefit from the defendant's allegedly wrongful
acts); *In re Wilmington Trust Corp. ERISA Litig.*, 943 F. Supp. 2d 478, 487-88 (D. Del. 2013)
(same); *see also Green v. Stuart*, 135 F.2d 33, 34 (5th Cir. 1943) (recognizing that city's
creditors could not be injured by actions that actually strengthened its financial situation).

In *Knauer*, the Seventh Circuit specifically commented that the district court "was
probably correct" to dismiss tort claims brought by a receiver for lack of standing when those
claims were based on alleged Ponzi scheme sales: "As we see it, Ponzi entities themselves are
not injured by the sales of securities.  Even if [the receivership entities] were arguably being
'misused' [by the individual Ponzi schemers], this misuse, at the sales stage, resulted only in the
fattening of the companies' coffers." *Knauer*, 348 F.3d at 234.  "In a Ponzi scheme such as this
one . . . where the Ponzi fraud pervaded the entire entity at all relevant times, we cannot find a
justiciable injury.  At least at the sales stage of the Ponzi scheme, every dollar tortiously
produced was revenue to Heartland." *Id*. at 234 n.4.  The same analysis applies here, given the
allegations in the Complaint that "all entities operated for Marcus' personal benefit or profit and
were essentially engaged in the business of thievery."  Compl. ¶ 11.

### 2.    Count III should be dismissed because there is no injury in fact.

The Receivership Entities were not injured by the Intercompany Transfers at issue in Count III; therefore, there has been no injury in fact, and the Receiver lacks standing to assert Count III.

The Complaint alleges that the Receivership Entities operated as alter egos of each other, as explained in detail in Section II.A *supra*, including through the commingling of funds.  The Receiver is bound by his allegations in this action and the Receivership Action, and it is thus uncontroverted that each Receivership Entity acted as the alter ego of the others—such that Intercompany Transfers merely represented money moving from the "left hand" to the "right hand" of a common enterprise.  Thus, there has been no injury in fact to the Receivership Entities as a result of the Intercompany Transfers, and the Receiver lacks standing to pursue Count III (for avoidance of the Intercompany Transfers).

### C.    The Receiver has asserted no claims upon which relief may be granted.

Pursuant to Federal Rules of Civil Procedure 8(a) and 12(b)(6), a claim must be dismissed if the plaintiff fails to allege facts supporting its essential elements or otherwise fails to state a facially plausible claim for relief.  *Ashcroft v. Iqbal*, 556 U.S. 662, 662 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).  "'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"  *Lawrence v. Bank of Am., N.A.*, 455 F. App'x 904, 906 (11th Cir. 2012) (quoting *Iqbal*, 556 U.S. at 678).

The plaintiff cannot meet his burden by raising unreasonable inferences or averring either "conclusions of law or sweeping legal conclusions cast in the form of factual allegations . . . ." *United States v. Air Fla., Inc.*, 534 F. Supp. 17, 20 (S.D. Fla. 1982).  Indeed, the Federal Rules "require[] more than labels and conclusions," and "a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555; *see also Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").  Indeed, the Rules "demand[] more than an unadorned, the defendant-unlawfully-harmed-me accusation."  *Iqbal*, 556 U.S. at 678.  None of the Receiver's claims clear these hurdles.

13

### 1.   Counts I and II, alleging aiding and abetting, should be dismissed because PNC lacked actual knowledge of the fraud scheme.

Both aiding and abetting claims should be dismissed because the Receiver has not alleged facts sufficient to show that PNC had either actual, subjective knowledge of Marcus's tortious scheme, or intent to further it.  The Receiver alleges in Counts I and II that PNC aided and abetted Marcus, who allegedly breached his own fiduciary duties to the Receivership Entities by, among other things, committing the consumer fraud scheme and misappropriating (and thereby converting) the entities' funds "for his personal use and benefit[.]"  Compl. ¶ 74.  Count I alleges that PNC "had actual and constructive knowledge of Marcus' breach of fiduciary duty and rendered substantial assistance in regard to such breach by affording Marcus special privileges, by enabling and allowing continuous, suspicious and obviously fraudulent banking activity, and by failing to adhere to federal, local and internal regulatory banking procedures and policies[.]"  *Id*. ¶ 71.  Count II alleges that "PNC had actual and constructive knowledge of Marcus' acts in misappropriating the funds of the Receivership Entities by virtue of transactions with occurred during the banking relationship[.]"  *Id*. ¶ 75.  Count II alleges that PNC rendered "substantial assistance" solely by claiming that PNC violated banking regulations, including the Bank Secrecy Act ("BSA"),[6] and other banking procedures.  *Id*. ¶¶ 72-76.

The heightened pleading requirement of Fed. R. Civ. P. 9(b) applies to claims alleging aiding and abetting breach of fiduciary duty sounding in fraud, and claims alleging aiding and abetting conversion premised on fraud, such as the Receiver's claims.  *Vasquez v. H.K. & Shanghai Banking Corp*., 18 Civ. 1876 (PAE), 2019 U.S. Dist. LEXIS 90716, *42 (S.D.N.Y. May 29, 2019).  The Receiver's assertion that PNC had knowledge represents only a conclusory claim, unsupported by sufficient factual allegations to support an inference of actual, subjective knowledge of the salient issues.  These allegations do not amount to actual knowledge that PNC knowingly furthered fraud and other torts under either the standards of Rule 9(b) or Rule 8(a).

### a)   The governing law.

Under Florida law, aiding and abetting liability requires: (1) an underlying violation by the primary wrongdoer; (2) actual knowledge of the underlying violation by the alleged aider and

---

[6]   The BSA codifies a broad range of reporting, recordkeeping, and Anti-Money Laundering ("AML") program requirements for covered financial institutions—including banks like PNC.  *See* 31 U.S.C. § 5311.

abettor; and (3) intentional and substantial assistance by the alleged aider and abettor to the primary wrongdoer in furtherance of the underlying violation. *See Lawrence v. Bank of America*, 455 F. App'x 904, 906-07 (11th Cir. 2012); *Perlman v. Bank of Am., N.A.*, No. 11-80331, 2011 U.S. Dist. LEXIS 161084, at *13 (S.D. Fla. Dec. 21, 2013); *see also, e.g.*, *Bruhl v. PricewaterhouseCoopers Int'l*, No. 03-23044, 2008 U.S. Dist. LEXIS 30962, at *13 (S.D. Fla. Mar. 31, 2008) (noting that aiding and abetting liability attaches "only when a defendant ***actively participates*** in the alleged violation") (emphasis added).   Because aiding and abetting is an intentional tort, *Perlman v. Bank of Am., N.A.*, No. 11-80331, 2014 U.S. Dist. LEXIS 193658, at *9 n.1 (S.D. Fla. Sept. 19, 2014); *Allerton v. State Dep't of Ins.*, 635 So. 2d 36, 39 (Fla. 1st DCA 1994), allegations of "substantial assistance" must show that the defendant actually shared the primary actors' bad intent to commit the underlying tort.  *See Taylor v. Am. Chemistry Council*, 576 F.3d 16, 35 (1st Cir. 2009); *Mw. Cattle Mktg., LLC v. Legend Bank, N.A.*, No. 17-375, 2018 WL 2244339, at *6 (N.D. Tex. May 16, 2018); *In re Managed Care Litig.*, 430 F. Supp. 2d 1336, 1357 (S.D. Fla. 2006).

"[T]he knowledge element is really the crux of aiding and abetting liability." *Perlman*, 2011 U.S. Dist. LEXIS 161084, at *16; *see also Perlman v. Wells Fargo Bank, N.A.*, 559 F. App'x 988, 993 (11th Cir. 2014) (per curiam); *Lawrence*, 455 F. App'x at 907.  Establishing actual knowledge requires subjective knowledge by defendant, and not merely that defendant had a reason to know of the fraud.  *See Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 31 (2d Cir. 2012) ("The phrase 'actual knowledge,' . . . is frequently used to denote subjective belief."); *Colliers Lanard & Axilbund v. Lloyds of London*, 458 F.3d 231, 237 (3d Cir. 2006) (equating "actual knowledge" with "subjective awareness"); *Graves v. Plaza Med. Ctrs., Corp.*, No. 10-23382-CIV, 2017 U.S. Dist. LEXIS 28049, at *17 (S.D. Fla. Feb. 27, 2017).  Likewise, the requisite degree of knowledge must all be held by the same individual.  *E.g. Helf v. Chevron U.S.A. Inc*., 361 P.3d 63, 66 (Utah 2015) (collective knowledge cannot be used to establish agency liability for intentional torts).

Indeed, Florida courts are "[m]indful of the potentially devastating impact aiding-and-abetting liability might have on commercial relationships." *Wiand v. Wells Fargo Bank, N.A.*, 938 F. Supp. 2d 1238, 1244 (M.D. Fla. 2013) (citations omitted).  As a result, Florida courts are hesitant to impute "actual knowledge" to financial institutions of the alleged underlying wrongs. *See id.*  "[M]erely alleging that a bank should have known about [the underlying violation] based

solely on a series of purportedly atypical transactions is not sufficient to survive" a motion to dismiss. *Perlman*, 559 F. App'x at 993. Likewise, "[c]onclusory statement[s] that a defendant 'actually knew' [are] insufficient to support an aiding and abetting claim where the facts in the complaint only suggest[] that the defendant 'should have known' that something was amiss." *Platinum Estates, Inc. v. TD Bank, N.A.*, No. 11-60670-CIV, 2012 U.S. Dist. LEXIS 30684 (S.D. Fla. Mar. 7, 2012) (dismissing aiding and abetting fraud claim based on bank's alleged involvement in *Rothstein* Ponzi scheme, even though complaint alleged that bank permitted hundreds of millions of dollars in Ponzi scheme funds to flow through bank in violation of banking regulations and internal procedures; bank lulled scheme victims into false sense of security by providing verbal and/or written assurances that settlement funds existed and could be disbursed only director to the investors; and bank allowed fraudsters to use its conference rooms to pitch investors and directly participated in same).

> **b)** **The Complaint's allegations are legally insufficient.**

The Complaint's allegations regarding actual knowledge are insufficient. The Receiver suggests that PNC should have known that Marcus was defrauding others based on: the Receivership Entities' account activity; alleged irregularities under the BSA and the bank's own internal procedures; bank employees' on-site visit to the Receivership Entities' office; unspecified reports of Marcus's bad acts; and the alleged independent misconduct of a former PNC employee, Denton Douglas, which are unrelated to any underlying fraud scheme by Marcus, and which include conduct after PNC shut down the accounts in early December 2015. *See* Compl. ¶¶ 23-27, 28-32, 38-41, 43, 46-69.

But nowhere does the Receiver allege (nor could he) that PNC *actually* knew of the underlying wrongs at issue—*i.e.*, of Marcus's alleged consumer fraud scheme and his diversions of funds from the Receivership Entities for personal uses. The Complaint also makes clear that there are two distinct time periods at issue: (1) January to July 2014, when entities controlled by Marcus held accounts at PNC until PNC shut them down due to overdraft activity; and (2) May through December 2015, when other entities allegedly controlled by Marcus again held accounts, until PNC once again shut them down for similar reasons. Ultimately, the Complaint suggests, at most, that PNC should have prevented Marcus from opening up accounts in 2015. It does not demonstrate that PNC actually knew of the underlying torts at issue.

    i.  **Alleged "red flags" do not equate to actual knowledge.**

  The Receiver's allegations that the Receivership Entities were engaged in a "very high number of wire transfers," that Marcus "was taking out substantial amounts of cash as profit," that there was possible "check kiting," and that the accounts were "chronically overdrawn," *id.* at ¶¶ 28-29, 31-32, fall far short of establishing actual knowledge of Marcus's wrongdoing.  Actual knowledge is not pleaded where the plaintiff offers nothing more "than allegations that a bank had knowledge of suspicious activities or even 'skullduggery[.]'" *Litson-Gruenberg v. JPMorgan Chase & Co.*, No. 09-56, 2009 U.S. Dist. LEXIS 117749, at *2 (N.D. Tex. Dec. 16, 2009); *see also Perlman*, 559 F. App'x at 993-94.  Alleged cause for suspicion is simply not the same as actual knowledge.  *See In re Agape Litig.*, 773 F. Supp. 2d 298, 310 (E.D.N.Y. 2011) ("red flags" that might arise from account transactions do not give rise to "actual knowledge"); *Isaiah v. JPMorgan Chase Bank, N.A.*, No. 16-21771, 2017 U.S. Dist. LEXIS 190051, at *6-10 (S.D. Fla. Nov. 14, 2017) (granting bank's motion to dismiss because plaintiff did not show that bank had actual knowledge of customer's fraudulent activities).

  The Receiver's similar allegations of the "reports" that PNC supposedly received from unidentified Receivership Entity employees—*i.e.*, vague reports that "Marcus was a 'fraud,' a 'liar,' and was 'doing fraud and . . . not doing stuff that he promised the [Receivership Entities'] clients,'" Compl., ¶ 30—are woefully insufficient.  The Federal Rules of Civil Procedure require more than these conclusory allegations, in which the Receiver fails to plead exactly what information was shared with PNC, when and by whom.  *See* Fed. R. Civ. P. 8(a) and 9(b); *see also Isaiah*, 2017 U.S. Dist. LEXIS 190051, at *6-10 (granting bank's motion to dismiss because plaintiff did not show that bank had actual knowledge of customer's fraudulent activities, and distinguishing actual knowledge of Ponzi schemer's fraud from "knowledge of the symptoms of the Ponzi scheme" when complaint alleged that bank's "withdrawal slips themselves note that there was 'fraud on account,' and that this fraudulent activity was detected by [the bank's] internal anti-money laundering controls.").

  The case of *Perlman vs. Wells Fargo Bank* is instructive.  There, this same Receiver sued Wells Fargo on behalf of similar receivership entities involved in a South Florida Ponzi scheme—which was operated by George Theodule—and alleged that the bank aided and abetted the Ponzi scheme's operation.  559 F. App'x at 989-90.  As he does here, the Receiver asserted, in part, claims based on aiding and abetting a breach of fiduciary duty, aiding and abetting

17

conversion, avoidance of fraudulent transfers, and the aiding and abetting of fraudulent transfers. Specifically, he alleged that Theodule began his relationship with Wells Fargo by opening four accounts for Creative Capital Consortium, LLC in March 2008.  *Id.*  Subsequently, Theodule's sister and wife opened at Wells Fargo 36 "feeder accounts," which transferred $2.2 million directly to the Creative Capital accounts in the first month alone.  *Id.* at 991.  Within six weeks after opening the Creative Capital accounts, Wells Fargo placed a freeze on one of the "feeder" accounts, but removed the freeze four days later after receiving a "Creative Capital Consortium Business Plan" from one of Creative Capital's employees.  *Id.*  The Receiver alleged "that the business plan was 'nonsensical' on its face and contained numerous obvious inconsistencies.'" *Id.*  Five months after the accounts were opened, Wells Fargo "closed most, but not all, of the Creative Capital accounts for suspicious activity."  *Id.*

The Eleventh Circuit agreed with the district court that these factual allegations failed to state an aiding and abetting claim:

> Perlman alleges a multitude of atypical transactions and procedural oddities, including: Theodule's opening of various accounts, numerous transfers amongst the accounts within short time periods, thousands of deposits of even dollar amounts, large cash deposits and withdrawals, the absence of any investment activity, and Wells Fargo's lifting of the freeze on the ["feeder"] account without further investigation.  These allegations fall short of raising a plausible inference that Wells Fargo actually knew that Theodule was engaging in fraudulent activity. At most they list facts that could arouse suspicions, and are not sufficient to trigger any obligation by Wells Fargo to investigate.  *Lawrence*, 455 F. App'x at 907.  While these "red flags" "may have put the bank[] on notice that some impropriety may have been taking place, those alleged facts do not create a strong inference of actual knowledge. . . ."  *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 294 (2d Cir. 2006).

*Id.* at 993-94.[7]  Thus, even assuming that the allegations here about the Receivership Entities' account activity did raise or should have raised "red flags," these warnings do not show actual

---

[7]     The *Lawrence* court, cited by the *Perlman* court, similarly upheld the district court's dismissal of aiding and abetting claims for failure to state a claim:

> Plaintiffs alleged that Bank of America authorized numerous deposits, withdrawals, and wire transfers involving large amounts of money and that the Premier Banking Representatives received substantial commissions.  Although Plaintiffs alleged that the transactions were atypical and therefore Bank of America should have known of the Ponzi scheme, such allegations are insufficient under Florida law to trigger liability.  Florida law does not require banking

knowledge by PNC of the underlying misconduct by Marcus.  The Complaint here is merely another version of the complaint in *Perlman v. Wells Fargo Bank*, dressed up with conclusory claims of actual knowledge in light of the Receiver's prior failing in the Eleventh Circuit.

### ii.   The Complaint's allegations regarding BSA duties do not equate to actual knowledge.

The Complaint sets forth several claims regarding the monitoring and "Know-Your-Customer" requirements allegedly imposed on financial institutions by the BSA, and PNC's implementation of them.  *See* Compl. ¶¶ 23-27, 54-55.  These allegations also fail to demonstrate that PNC had any *actual knowledge* about the relevant illegal or tortious activity by Marcus.

PNC was legally entitled "to assume that individuals who [had] the legal authority to handle the [Receivership Entities'] accounts [did not] misuse the entit[ies'] funds."  *O'Halloran*, 350 F.3d at 1205; *see also Lamm v. State Bank & Tr.*, 749 F.3d 938, 948 (11th Cir. 2014) (noting that banks "generally have no duty to investigate transactions made by authorized agents of the account holder").  Even activities that "appear atypical upon review" do not trigger a duty for the bank to dig deeper, "to ensure that its customer is not engaged in wrongdoing."  *Wiand*, 938 F. Supp. 2d at 1245.[8]  Such safeguards against rampant bank liability are consistent with the fact that the BSA does not support a private cause of action against a bank for failure to monitor accounts or take affirmative actions to prevent fraud.  *See, e.g.*, *James v. Heritage Valley Fed. Cred. Union*, 197 F. App'x 102, 106 (3d Cir. 2006); *AmSouth Bank v. Dale*, 386 F.3d 763, 777 (6th Cir. 2004); *Zachman*, 183 F. Supp. 3d at 924; *Marchak v. JPMorgan Chase & Co.*, No. 15-cv-4297, 2016 U.S. Dist. LEXIS 92995, at *8 (E.D.N.Y. Jul. 15, 2016).

---

institutions to investigate transactions.  *Home Fed. Sav. & Loan Ass'n of Hollywood v. Emile*, 216 So. 2d 443, 446 (Fla. 1968); *cf. O'Halloran v. First Union Nat'l Bank of Fla.*, 350 F.3d 1197, 1205 (11th Cir. 2003) (finding that banks have the "right to assume that individuals who have the legal authority to handle the entity's accounts do not misuse the entity's funds").  Therefore, Bank of America, in providing routine banking services, was not required to investigate Diamond's transactions.

*Lawrence*, 455 F. App'x at 907.

[8]     Indeed, a contrary rule of law "would virtually require banks to offer not only financial, but investigatory, services." *Ballard v. Royal Tr. Bank*, No. 98-55592, 1999 U.S. App. LEXIS 31595, at *10 (9th Cir. Nov. 2, 1999).

Courts likewise have recognized that the BSA and its monitoring and reporting duties do not define a financial institution's standard of care. *See Wiand v. Wells Fargo Bank, N.A.*, 86 F. Supp. 3d 1316, 1322 (M.D. Fla. 2015) (deeming "unpersuasive" the contention that the BSA gives rise to bank's duty of care to monitor customer accounts and investigate account activity); *Towne Auto Sales v. Tobsal Corp.*, 2017 U.S. Dist. LEXIS 187990, Case: 1:16-cv-02739-CAB (N.D. Ohio Nov. 14, 2017); *Silverman Ptnrs., L.P. v. First Bank*, 687 F. Supp. 2d 269, 282 (E.D.N.Y. 2010) (holding that a bank owes no legal duty "to a customer to investigate the good faith representations of his or her business partner, or to track a co-borrower's transactions to prevent fraud[,]" and rejecting plaintiff's claim that the bank's KYC policy creates a duty to investigate customers: "[w]hile statutes and other rules of conduct may be used to inform what constitutes a reasonable standard of care in a given situation, the rules do so only to the extent they were created to protect the complainant. . . . [T]he laws and rules cited by the plaintiff are intended to protect the banks and the general public from harm.  They were not created to protect borrowers from harm done by co-borrowers.").

Thus, the allegations regarding PNC's KYC efforts or PNC employees' visit to the Receivership Entities' office (labelled by the Receiver as the "boiler room"), Compl., ¶¶ 23, 27, 54, as well as allegations that the Receivership Entities were transferring "big, big amounts" to each other, "including between accounts held by for-profit and (supposedly) not-for-profit companies," Compl. ¶ 55, fail to show that PNC had actual knowledge of Marcus's alleged wrongdoing. Financial institutions "always have more information about the client's conduct than the general public, making them vulnerable to the hindsight accusation that they knew of the client's wrongdoing or were willfully blind.  Courts are unwilling to make such institutions the guarantors of their customers' conduct.  With regard to banks, courts have consciously adopted the requirement of actual knowledge of specific wrongdoing" to bar plaintiffs (like the Receiver) from premising liability on nothing more than a bank's access to customer information. *El Camino Resources, Ltd. v. Huntingdon Nat'l Bank*, 722 F. Supp. 2d 875, 908 (W.D. Mich. 2010). *See Wiand*, 86 F. Supp. 3d at 1322 ("Florida law imposes no duty on a bank to investigate transactions.") (citations omitted).

### iii.   The Complaint's allegations regarding former employee Douglas do not equate to actual knowledge.

Finally, allegations as to Denton Douglas's dealings with Marcus do not assist the Receiver.  Even assuming *arguendo* that Douglas's knowledge could be imputed to PNC, the

Receiver still has not pleaded any fact establishing that Douglas had actual knowledge that Marcus committed the specific torts at issue. To the contrary, the Complaint alleges that Douglas knew that PNC closed the accounts held by certain Receivership Entities in 2014; maintained a business relationship with Marcus outside of PNC; assisted Marcus with obtaining business accounts at PNC in June 2015 until PNC shut those accounts down in December 2015; and maintained a relationship with Marcus after PNC no longer banked those entities. *See* Compl. ¶¶ 33-44; 47-53; 56-58; 60-64. Again, suspicion or even knowledge that Marcus was attempting to circumvent the bank's internal policies and procedures is not the same as actual knowledge that Marcus committed a broad consumer fraud scheme and stole funds from the Receivership Entities. *Wiand*, 938 F. Supp. 2d at 1246; *Isaiah*, 2017 U.S. Dist. LEXIS 190051, at *9-10. [9]

Moreover, the Receiver took Douglas' deposition. If Douglas admitted knowing of the fraud, the Receiver certainly would have so alleged. He did not. Accordingly, Counts I and II should be dismissed.

> **2.      Counts III and V, FUFTA claims premised on funds transferred to or by Receivership Entities, should be dismissed because PNC was not a party to these transfers.**

Counts III and V, which are FUFTA claims premised on funds transferred to or from Receivership Entities' bank accounts, should be dismissed because PNC never acquired an interest in the funds being transferred. Accordingly, the alleged transactions do not qualify as "transfers" for the purposes of FUFTA.

To prove a FUFTA claim, a plaintiff must allege that a transferee takes hold of "an asset or an interest in an asset," "includ[ing] payment of money, release, lease, creation of a lien or other encumbrance." Fla. Stat. § 726.102(14). A claim may be asserted to avoid any such "transfer." Fla. Stat. § 726.108(1)(b). As to Counts III and V, there has been no "transfer" whereby PNC acquired either the Receivership Entities' funds, or any interest in them. It is well-

---

[9]      This Court has recognized that aiding and abetting is an intentional tort. *See Perlman*, 2014 U.S. Dist. LEXIS 193658, at *9 n.1. Thus, aiding and abetting claims must be dismissed absent allegations that the defendant intended to commit the underlying tort. *See Taylor*, 576 F.3d at 35; *In re Managed Care Litig.*, 430 F. Supp. 2d at 1357. As explained above in detail, no such facts are alleged here, and no such inference arises from the few relevant facts that the Receiver has alleged. Accordingly, this is a separate and independent basis for dismissal.

settled in both FUFTA and analogous bankruptcy proceedings that "[w]hen banks receive money for the sole purpose of depositing it into a customer's account . . . the bank never has actual control of the funds . . . ."  *In re Chase & Sanborn Corp.*, 848 F.2d 1196, 1200 (11th Cir. 1988); *see also Bonded Fin. Servs. v. European Am. Bank*, 838 F.3d 290, 898 (7th Cir. 1988) (refusing to hold bank liable for fraudulent transfer where it was only a "financial intermediary" because to do otherwise would impose "staggering" costs on financial institutions and their customers).[10]  A FUFTA claim is "'inappropriate as applied to a bank. It does not appear from a plain reading of the statute that it was intended to be used in this manner.' . . . There does not appear to be any set of facts that could support a FUFTA claim against a bank, particularly if that bank was only providing routine banking services . . . and not taking control and dominion over the funds in question."  *Meridian Trust Co. v. Batista*, No. 17-23051-WILLIAMS, 2018 U.S. Dist. LEXIS 166556, at *27-28 (S.D. Fla. Sept. 24, 2018) (quoting *Isaiah v. Wells Fargo Bank, N.A.*, Case No. 14-15246-CA-40, at *1 (Fla. 11th Cir. Ct. 2015)).

Accordingly, Florida courts have routinely dismissed receivers' FUFTA claims asserted against banks and premised on the transfer of funds involving other parties.  Because PNC was not a party to any of the so-called Intercompany Transfers or Deposit Transfers, and never acquired any interest in or control over the funds tied to those transfers, Count III and Count V each should be dismissed with prejudice.  *See, e.g.*, *Wiand*, 86 F. Supp. 3d at 1327-29; *see also Welch v. Regions Bank (In re Mongelluzzi)*, 591 B.R. 480, 493 (Bankr. S.D. Fla. 2018); *Isaiah*, 2017 U.S. Dist. LEXIS 190051, at *4-5 ; *Walker v. Hallmark Bank & Trust, Ltd.*, 707 F. Supp. 2d 1317, 1321 (S.D. Fla. 2010); *Super Vision Int'l, Inc. v. Mega Int'l Commercial Bank Co.*, 534 F. Supp. 2d 1326, 1343-44 (S.D. Fla. 2008), *aff'd*, No. 08-15031, 2009 U.S. App. LEXIS 8089, at *1 (11th Cir. Apr. 17, 2009) (*per curiam*); *Freeman*, *v. First Union Nat'l Bank*, 865 So. 2d 1272, 1277 (Fla. 2004) ("We simply can see no language in FUFTA that suggests an intent to create an independent tort for damages."); *id.* ("There simply is no language in FUFTA that suggests the creation of a distinct cause of action . . . against non-transferees. Rather, it appears

---

[10]      In contrast, courts routinely have allowed receivers to assert fraudulent transfer claims— so-called "claw backs"—against investors of a Ponzi scheme in order to recover the "profit" or "interest" paid to the investor above and beyond their investment.  *See, e.g., Donnell v. Kowell*, 533 F.3d 762 (9th Cir. 2008).  This case does not represent a "claw back" scenario.

that FUFTA was intended to codify an existing but imprecise system whereby transfers that were intended to defraud creditors could be set aside.").

Because typical transactions in a bank account held by an entity being used during an alleged scheme simply never qualify as "transfers" as a matter of Florida law and FUFTA, there is no need to show that PNC acted in good faith. *See Wiand*, 86 F. Supp. 3d at 1327-29; *Welch*, 591 B.R. at 493; *Isaiah*, 2017 U.S. Dist. LEXIS 190051, at *4-5. Even if the Receiver argues the contrary, the Eleventh Circuit's decision in *Perlman v. Wells Fargo Bank, N.A.*, disposes of this argument. There, this Receiver argued that the district court should not have dismissed his fraudulent transfer claims because the complaint alleged that the defendant bank had not acted in good faith. 559 F. Appx. at 994. The Eleventh Circuit rejected that claim and upheld the dismissal because the district court properly had concluded that the complaint failed to plausibly allege knowledge/lack of good faith—despite strenuous arguments by the Receiver to the contrary. *Id.* at 994. The same situation applies here. Section II.C.1.b, *supra*, discusses in detail this Complaint's failure to demonstrate actual knowledge by PNC, and the *Perlman* case.

### 3. Count IV should be dismissed because it is not sufficiently pled.

Count IV should be dismissed because the Receiver has failed to establish that the transfers made to PNC accounts to satisfy overdraft fees (the "Overdraft Transfers") are avoidable, a necessary predicate to survival of this FUFTA claim. Count IV is sparse, but the Receiver appears to be attempting to avoid alleged Overdraft Transfers totaling $457,064.78 (to cover $112,960.48 in total overdrafts) with two separate but related claims: (1) the Overdraft Transfers are avoidable because they were made in an attempt to defraud the Receivership Entities and consumers under Florida Statute 726.105(a)(1); and (2) the Overdraft Transfers are avoidable because the Receivership Entities "received less than a reasonably equivalent value in exchange" as required by Florida Statutes 726.105(1)(b) and 726.106(1). Compl. ¶¶ 94-96. Neither theory is sufficiently supported by the Complaint's allegations.

#### a) The Receiver has failed to establish fraudulent intent for the Overdraft Transfers.

Florida Statute 726.105(1)(a) provides that "if [a] debtor made the transfer or incurred the obligation . . . with actual intent to hinder, delay, or defraud any creditor," then the transfer may be avoided. The statute also lays out eleven factors for consideration in determining "actual intent." Count IV, however, makes no attempt at addressing these factors. In fact, Count IV does no more than state in a conclusory manner that the Receivership Entities initiated transfers

to pay the overdraft fees in order "to prevent [] fraudulent activity in the accounts being discovered and revealing the scheme." Compl. ¶ 92.

A simple reiteration of the elements of a statute, and conclusory allegations of fraudulent intent, are insufficient to survive a motion to dismiss in this context. [11]  *See Cook v. Roberts (In re Yahweh Ctr., Inc.)*, No. 16-4306, 2019 Bankr. LEXIS 885, at \*16 (Bankr. E.D.N.C. Mar. 22, 2019).  The Plaintiff in *Cook*, a bankruptcy trustee, tried to avoid over $300,000 of overdraft fees the debtor had paid to Defendant by simply alleging the payments were made "with the intent to hinder, delay, and defraud the IRS."  *Id.* at \*8.  The court found that the allegation was conclusory because there were "no specific facts alleged that could support an ultimate finding that [the debtor] had paid the fees charged by [Defendant] *for the purpose of* preventing the IRS from collecting the taxes and penalties owed to it."  *Id.* at \*19 (emphasis in original); *see also id.* ("Simply failing to pay a creditor does not establish intent to hinder, delay, or defraud.").  The court also found it significant that Plaintiff had failed to plead any allegations to support the "badges of fraud" outlined in North Carolina's Voidable Transfer Act.  *Id.* at \*19-21.

Just as in *Cook*, the Receiver has not pled a single non-conclusory allegation, specific to the Overdraft Transfers, which would establish that the Receivership Entities made the Overdraft Transfers "for the purpose of" covering up the fraud scheme.  That fact alone compels dismissal under Florida Statute 726.105(1)(a); *see also supra* Section II.C.1.b, discussing the lack of sufficient allegations regarding knowledge by PNC.

---

[11]      There is a split within the Eleventh Circuit "as to whether fraudulent transfer claims must be pled with the particularity required by Rule 9(b)."  *Oginsky v. Paragon Properties of Costa Rica LLC*, 784 F. Supp. 2d 1353, 1369 (S.D. Fla. 2011).  Many decisions in this Court require fraudulent transfer claims to be pled with particularity.  *E.g.*, *Meridian Trust*, 2018 U.S. Dist. LEXIS 166556, at \*26 n.8; *Ben-Yishay v. Mastercraft Dev., LLC*, No. 08-14046-CIV, 2009 U.S. Dist. LEXIS 126874, at \*4 (S.D. Fla. Dec. 14, 2009); *Special Purpose Accounts Receivable Co-op. Corp.*, No. 06-61055-CIV-MORENO, 2007 U.S. Dist. LEXIS 70886, at \*5 (S.D. Fla. Sept. 25, 2007).  Applying either Rule 9(b) or Rule 8(a)(2), Count IV should be dismissed.

       **b)**     **The Receivership Entities received reasonably equivalent value in exchange for the Overdraft Transfers.**

Florida Statutes 726.105(1)(b) and 726.106(1) allow for avoidance of transfers when the debtor receives less than "reasonably equivalent value."[12]  But again, Count IV has not provided "sufficient detail to state a plausible claim that [the Receivership Entities] did not receive reasonably equivalent value for" the Overdraft Transfers.  *Cook*, 2019 Bankr. LEXIS 885, at *16.  In *Cook*, the court held that Plaintiff had failed to refute that debtor had received "reasonably equivalent value" when it had paid overdraft and late fees.  *Id.*  The Court explained:

> There is no allegation that any fee was not consistent with the contractual relationship or that any fee was improper, unreasonable, or did not compensate Defendant for a service provided to [the debtor] in connection with the accounts. Further, there is no allegation as to whether a particular fee covered a check for which there were insufficient funds (or not).  There is no copy of any account agreement.  There is simply no other information other than that the fees were charged, with a conclusory allegation that the debtor did not receive reasonably equivalent value for the fees.

*Id.* at *15.

The conclusory allegations in Count IV mirror those of the fraudulent transfer claims dismissed in *Cook*.  As *Cook* makes clear, simply alleging the charge and payment of overdraft fees, without more, is insufficient to survive a motion to dismiss.  The Complaint is devoid of any allegation indicating the fees were: 1) contrary to any contractual obligations, 2) improper or unreasonable in size, or 3) not paid to compensate PNC for the incurred overdraft fees in connection with services provided to the Receivership Entities.  *See Cook*, 2019 Bankr. LEXIS 885, at *15.[13]  Because Count IV does no more than provide a "formulaic recitation of the elements" of the relevant statutes, it should be dismissed.  *See Iqbal*, 129 S. Ct. at 1951.[14]

---

[12]     "Value is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied."  Fla. Stat. § 726.104(1).

[13]     This requirement applies to both Sections 726.105(1)(a) and 726.105(1)(b).  *See* Fla. Stat. § 725.109(1) ("A transfer or obligation is not voidable under s. 726.105(1)(a) against a person who took in good faith and for a reasonably equivalent value . . . .").

[14]     If Count IV is not dismissed in full, then it should be dismissed insofar as it rests on the dollar-for-dollar repayment of the alleged $112,960.48 in total overdrafts (as contrasted with the alleged $457,064.78 in total overdrafts and charges).  "By definition, dollar for dollar credit is reasonably equivalent value."  *Welch*, 591 B.R. at 499; *id.* at 496 ("dollar for dollar payment of

### 4.     The statute of limitations bars each claim in part.

Each count of the Complaint that alleges or depends upon specific transactions occurring from January 2014 through December 2015, is partially time-barred.  These alleged transactions are described in the attachments to the Complaint, which set forth detailed schedules regarding deposits and disbursements from the bank accounts at issue and make crystal clear that certain account activity for certain Receivership Entities (Paralegal Staff Support LLC and American Credit Shield LLC) occurred only from January through July 2014, and then totally ceased except for a handful of transactions involving Paralegal Staff Support, through January 2015.  Then, there was a complete break in activity, and new account activity for totally different Receivership Entities that began in June 2015.  Because this action was not commenced until June 3, 2019 (*see generally* Compl.), and because the statute of limitations for each count in the Complaint is four years, each claim should be dismissed insofar as it rests on transactions occurring on or before June 2, 2015. [15]

### a)     Counts I and II.

The intentional torts alleged in Claims I and II are subject to a four-year statute of limitations.  Fla. Stat. § 95.11(3)(o).  Under Florida law, a cause of action generally accrues upon the <u>first</u> injury caused by another's wrongful act.  *City of Miami v. Brooks*, 70 So. 2d 306, 308 (Fla. 1954); *see also Hynd v. Ireland*, 582 So. 2d 772, 773 (Fla. 4th DCA 1991).  The detailed attachments to the Complaint demonstrate that the 2014 transactions are beyond the statute of limitations.  A court may grant a motion to dismiss based on the statute of limitations when the facts constituting the defense affirmatively appear on the face of the complaint and establish that

---

Overdrafts constitutes reasonably equivalent value"); *see also Se. Waffles, LLC v. United States Dep't of Treasury/IRS (In re Se. Waffles, LLC)*, 460 B.R. 132, 140 (B.A.P. 6th Cir. 2011) ("There is considerable case law holding that a dollar for dollar reduction in debt is sufficient to establish equivalent value.").

[15]     Deposits into Paralegal Staff Support LLC all occurred between January 2014 and January 2015, and total $11,191,893.31. *See* Compl., Ex. A, pp. 31-65 (detailing each alleged deposit received by Paralegal Staff Support LLC's account).  A total of $91,310.00 in Intercompany Transfers occurred on May 5, 2014 and April 29, 2014, as demonstrated in Exhibit B.  *Id.* Ex. B, p. 2 of 2.  And, as evidenced in Exhibit C to the Complaint, a total of $6,185.53 in Overdraft fees/charges are subject to the applicable four-year time bar.  *Id.* Ex. C.

the statute of limitations bars the action as a matter of law. *GLK, L.P. v. Four Seasons Hotel Ltd.*, 22 So. 3d 635, 636-37 (Fla. 3d DCA 2009).

### b) Counts III through V.

The FUFTA claims in Counts III through V are time-barred unless they are brought "within 4 years after the transfer was made or the obligation is incurred," and claims premised on actual fraud are time-barred unless they are brought "within 4 years after the transfer was made or the obligation is incurred, or, if later, within 1 year after the transfer or obligation was or could reasonably have been discovered" by the Receiver. Fla. Stat. § 726.110(1), (2). Those limitations periods are strictly construed, and they are not subject to any common-law doctrine of equitable tolling. *See, e.g.*, *Wiand v. Sarasota Opera Ass'n*, No. 10-248, 2011 U.S. Dist. LEXIS 109203, at *6 (M.D. Fla. Sept. 26, 2011).

Thus, each FUFTA claim is time-barred insofar as it is based on deposits or withdrawals made, or overdraft fees incurred, on or before June 2, 2015. Fla. Stat. § 726.110(2). Even if the Receiver argues that the FUFTA claims are based on actual fraud, not constructive fraud, so that he may assert those claims more than four years after the transfers at issue so long as they were asserted within one year of his discovery of the transfers, *cf.* Fla. Stat. § 726.110(1), Florida courts have held that the one year discovery period begins to run upon the date of the receiver's appointment. *See, e.g., Wiand v. Mason*, 2012 U.S. Dist. LEXIS 185133, at * 43-44 (M.D. Fla. Dec. 17, 2012) ("The Receiver was appointed as receiver for Traders on August 9, 2010, and the one-year discovery limitations period [for a FUFTA claim premised on actual fraud] runs from that date."). Here, the Complaint was filed **over two years** after the Receiver's appointment. The Receiver was appointed on May 17, 2017 and the Complaint was not filed until June 3, 2019.

Accordingly, each of the Receiver's claims should be dismissed with prejudice insofar as they rest on transactions occurring on or before June 2, 2015.

### D. The Complaint should be dismissed because the Receiver lacked authority to commence litigation against PNC.

The Receiver did not have Court authority to assert any claims against PNC when he commenced this action on June 3, 2019. Accordingly, the Complaint should be dismissed and, to the extent that any of his claims are deemed to be either cognizable or curable by amendment, he should be directed to commence a new action.

The May 17, 2017 Order appointing the Receiver did not authorize the Receiver to bring any commercial tort claims—exactly what Counts I through V are—against PNC or any other

third-party prior to obtaining Court approval.  The Receiver's defined and limited powers are tied to the Order's definition of "assets."  For example, the Order dictates that the "Receiver is directed and authorized to . . . [t]ake exclusive custody, control, and possession of all assets and documents of, or in the possession, custody or under the control of, the Receivership Defendants . . . ." *See* Receivership Action, Preliminary Injunction Order, ECF No. 21, § 10B, at p. 17.

> However, the Order specifically defines the term "assets" as only the following:

> any legal or equitable interest in, right to, or claim to, **any real or personal property**, including, but not limited to, "goods," "instruments," "equipment," "fixtures," "**general intangibles**," "inventory," "checks," or "notes," (**as these terms are defined in the Uniform Commercial Code**), lines of credit, chattels, leaseholds, contracts, mail or other deliveries, shares of stock, lists of consumer names, accounts, credits, premises, receivables, funds, and all cash, wherever located.

The Receiver's authority therefore was limited to pursuit of real and personal property of Marcus and the Receivership Entities in PNC's custody.  However, PNC has not possessed or controlled any such assets as defined by the Order since January 2016.  Therefore, there was no legal claim that could be brought by the Receiver against PNC to "recover or preserve assets" as defined in the Order.  *Id*. at p. 4 (emphasis added).

The UCC defines a "general intangible" as "any personal property, including things in action, other than accounts, chattel paper, commercial tort claims, deposit accounts, documents, goods, instruments, investment property, letter-of-credit rights, letters of credit, money, and oil, gas, or other minerals before extraction.  The term includes payment intangibles and software." UCC § 9-102(42). The UCC also *specifically excludes* "commercial tort claims," which are defined as "a claim arising in tort with respect to which: (A) the claimant is an organization; or (B) the claimant is an individual and the claim: (i) arose in the course of the claimant's business or profession; and (ii) does not include damages arising out of personal injury to or the death of an individual." *Id*. at § 9-102(13).  Accordingly, the Order explicitly did not permit the Receiver to pursue any commercial tort claims against PNC, in the absence of additional Court authority.

Recognizing this, the Receiver stated in prior filings that he intended to seek Court permission to file such third-party claims.  For example, in July 2018, he stated he would seek "this Court's approval to file lawsuits asserting fraudulent transfers and other claims against third parties."  Receivership Action, Receiver's 3d Interim Rpt., at ¶ 88 (July 19, 2018), ECF No. 274; *see also id*. at ¶¶ 8, 16.  Similarly, the FTC recognized in its Fourth Notice of Status Proceedings

that "[t]he Receiver has also indicated he may seek Court permission to pursue certain third party claims."  Receivership Action, Pls.' 4th Notice of Status of Proceedings, at ¶ 3 (Mar. 13, 2019).  Nevertheless, the Receiver failed to seek or obtain any such Court permission before filing the Complaint against PNC on June 3, 2019.  As a direct result, on June 13, 2019, the FTC and the State specifically alerted the Court to the fact that the Receiver had "recently initiated third-party litigation" (including but not limited to this action) and had done so without "seek[ing] Court permission to litigate third-party claims on a contingency fee basis."  *See* FTC Notice, ¶ 4.  The FTC and the State further noted that they had "informed [the Receiver] of their concerns regarding [his proposed] contingency fee percentage and the payment of costs."  *Id.* at 2.

Rather than withdrawing the Complaint (and then, if appropriate, re-filing it after obtaining authority to do so), the Receiver belatedly sought to get around his lack of authority by seeking leave to commence third-party actions—but only after filing the Complaint.  In so doing, he acknowledged that he had lacked authority to take such action in the first instance.  *See generally* Receivership Action, Receiver's Mot. to Approve Contingency Fee Agreement (June 17, 2019), ECF No. 384.  He did not seek or obtain *nunc pro tunc* relief.  Thus, the Court's July 22, 2019 approval of the Receiver's contingency fee arrangement, and the implied grant of authority to pursue this action, were merely prospective; they did not undo the Receiver's prior impropriety.  "The receiver is but the creature of the court; he has no powers except such as are conferred upon him by the order of his appointment and the course and practice of the court."  *SEC v. Nadel*, No. 09-8726, 2012 U.S. Dist. LEXIS 189560, at *21 (M.D. Fla. Apr. 25, 2012) (quoting *Booth v. Clark*, 58 U.S. 322, 331 (1854)) (internal quotation marks omitted).

Short of dismissal, there is no cure for the Receiver's lack of authority to have commenced this action.  The Receiver's lack of authority to assert and pursue claims for relief from PNC is not a mere technicality.  PNC will suffer actual prejudice if this Court does not exercise its inherent authority to control its docket and, in equity, dismiss the Receiver's Complaint.  As set forth above, each claim is partially time-barred.  If the Receiver had waited to commence this action until he had proper court authority to do so, greater portions of those claims would be subject to statute of limitations—meaning that PNC would be further shielded from his otherwise baseless claims.  Indeed, in his recent objections to the Magistrate Judge's Report and Recommendation that the Court deny the Receiver's motion to compel compliance with a subpoena issued to PNC, the Receiver admitted that his motivation for filing the

Complaint against PNC on June 3, 2015, without first obtaining court authority, was "to ensure that no portion of the claims became time-barred."  Receivership Action, Receiver Objections to June 11, 2019 Report and Recommendation, at p.4 n.2 (July 19, 2019), ECF. No. 395.  The Receiver should not be permitted to ignore the court-imposed limitations on his powers and sidestep the statute of limitations, and this Court should not countenance the Receiver's blatant disregard of his obligations to the Court.

## III.     CONCLUSION

For all of the foregoing reasons, PNC's motion should be granted, and the Receiver's Complaint should be dismissed with prejudice.  Further, and pursuant to Local Rule 7.1(b)(2), PNC hereby requests that the Court conduct oral argument on this Motion.  Due to the complexities of issues involved herein, PNC believes oral argument will materially assist the Court.

Dated: August 5, 2019

Respectfully submitted,

*s/Peter D. Hardy*

_____

Peter D. Hardy (admitted *pro hac vice*)
Diana M. Joskowicz (admitted *pro hac vice*)
**Ballard Spahr LLP**
1735 Market Street, 51st Floor
Philadelphia, PA 19103
Telephone: 215.864.8838
HardyP@ballardspahr.com

Melanie J. Vartabedian (admitted *pro hac vice*)
**Ballard Spahr LLP**
One Utah Center
201 South Main Street, Suite 800
Salt Lake City, UT 84111-2221
Telephone: 801.531.3000
Vartabedianm@ballardspahr.com

Mark S. Kokanovich (admitted *pro hac vice*)
**Ballard Spahr LLP**
1 E. Washington Street, Suite 2300
Phoenix, AZ 85004
Telephone: 602.798.5532
KokanovichM@ballardspahr.com

Dated: August 5, 2019

Respectfully submitted,

*s/Peter W. Homer*

_____

Peter W. Homer, Esq.
**Homer Bonner Jacobs, P.A.**
1441 Brickell Avenue
Four Seasons Tower, Suite 1200
Miami, FL 33131
Telephone: (305) 350-5100
PHomer@homerbonner.com

## <u>CERTIFICATION OF SERVICE</u>

I hereby certify that, on August 5, 2019, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will also send notice of this electronic filing to all counsel of record.

Respectfully submitted,

*s/Peter W. Homer*

Dated: August 5, 2019

_____

Peter W. Homer, Esq.